CLEMENT SETH ROBERTS (SBN 209203)
croberts@orrick.com
JACOB M. HEATH (SBN 238959)
jheath@orrick.com
WILL MELEHANI (SBN 285916)
wmelehani@orrick.com
JOHANNA L. JACOB (SBN 286796)
jjacob@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
Telephone:    +1-415-773-5700
Facsimile:    +1-415-773-5759

Attorneys for Plaintiff
POYNT CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## _____ DIVISION

| | |
|---|---|
| POYNT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>INNOWI, INC.,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Poynt Corporation ("Poynt"), by and through its undersigned attorneys, brings this action against Innowi, Inc. ("Innowi"), and alleges as follows:

## I.    PARTIES

1.    Plaintiff Poynt Corporation ("Poynt") is a Delaware corporation with a principal place of business at 4151 Middlefield Rd., 2nd Floor, Palo Alto, California 94303.

2.    Defendant Innowi, Inc. ("Innowi") is a California corporation with a principal place of business at 3240 Scott Blvd., Santa Clara, California 95054.

## II.    JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over Poynt's claims pursuant to 28 U.S.C. §§ 1331, and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839, *et seq*.  The Court possesses supplemental jurisdiction over Poynt's state law claims under 28 U.S.C. § 1367(a) because Poynt's federal and state law claims derive from a common nucleus of operative fact as set forth herein.

4.     This Court has general personal jurisdiction over Innowi because Innowi has systematic and continuous contacts with the State of California such that California is its "home" jurisdiction.  In particular, Innowi is incorporated in California, and has a principal place of business in Santa Clara, California.

5.     This Court has specific personal jurisdiction over Innowi because, as explained below, Poynt's causes of action arise directly from Innowi's activities in the State of California and in this judicial district.  In particular (a) the agreements protecting Poynt's confidential information and intellectual property were executed and violated in this district and (b) the trade secrets at issue in this case were developed and misappropriated here.

6.     Venue for Innowi is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Innowi resides in this district and, as explained elsewhere herein, a substantial part of the events and omissions giving rise to Poynt's claims occurred in this judicial district.

## III.    FACTUAL BACKGROUND

7.     Poynt sells industry-leading smart point-of-sale payment terminal products. Poynt's products include the Poynt Smart Terminal, which is the world's first smart terminal. The Poynt Smart Terminal creates an impeccable payments experience for merchants and customers by combining the robust functionalities of a mobile computer with the security and reliability of a traditional payment device.  Poynt also produces the Poynt 5, a mobile, single-screen, point-of-sale terminal solution that provides merchants with greater flexibility to bring the terminal to the customer.

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

8.      In addition to offering physical point-of-sale payment terminals, Poynt offers an array of software applications, available for use on Poynt's devices, that are designed to help businesses better navigate and organize their sales and inventory activities.

**A.      The Development Agreements and Development Project**

9.      Poynt began developing its flagship product, the Poynt Smart Terminal, in October 2013.

10.     In or around March 2014, Poynt had progressed in developing the proprietary software that would serve as the operating system for Poynt's payment platform, and had developed design requirements for the associated hardware.

11.     In March 2014, Poynt began negotiating with Whizz Systems, Inc. ("Whizz") to retain the services of a team of Whizz-affiliated developers at Innowi, Inc. ("Innowi") to build the hardware for Poynt's payment terminal in conformity with Poynt's design requirements.

12.     During negotiations, Whizz's President, Muhammad Irfan, introduced Poynt to the Innowi team led by Zia Hasnain, the founder and CEO of Innowi.

13.     To protect Poynt's confidential information, Poynt and Whizz executed a Mutual Non-Disclosure Agreement ("NDA"), a copy of which is attached as **Exhibit A**.  Pursuant to the NDA, each party's confidential business and technical information was to be maintained in strict confidence and could not be used for any purpose except for the business opportunity embodied by the potential Poynt development project.  **Ex. A ¶ 2**.  The NDA also required a receiving party to return the disclosing party's confidential information at the disclosing party's request and to provide the disclosing party with an officer's certificate certifying compliance.  **Ex. A ¶ 4**.

14.     By June 2014, Poynt and Whizz/Innowi had reached a confidential agreement (the "Development Agreement") in which Whizz/Innowi agreed to develop the hardware for a payment terminal product meeting Poynt's regulatory, certification, cost and design requirements (the "Development Project"), a copy of which will be filed under seal as **Exhibit B**.  The Development Agreement required that Whizz/Innowi achieve pilot production for the product by December 2014 and provided that Poynt would own ***any and all*** intellectual property associated with or otherwise derived as a result of the project.

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

15.     The Development Agreement assigned Zia Hasnain as the Project Lead in charge of developing the hardware for Poynt's payment terminal and required Innowi to commit its "A" team to the project on a full time and exclusive basis.  On or around June 2, 2014, Zia Hasnain signed the Development Agreement on behalf of Whizz and handwrote in the signature block to indicate that he was also signing the Development Agreement on behalf of Innowi.

16.     Following the execution of the Development Agreement, the entire Innowi team worked full time on Poynt's project.  The team included Zia Hasnain, Vijaykumar Santhakumar, Asif Rao, Faisal Saeed, and Chris Woon.

17.     At the time the parties entered into the Development Agreement, Innowi publicly emphasized that its core team's prior experience related primarily to mobile and wireless telecommunications products and that it had general experience in consumer electronics, wireless communication, medical technology, and automotive product development.  *See* https://web.archive.org/web/20141217125302/http://innowi.com/.   Innowi's web site did not suggest that it had any prior experience with payment terminal products.

18.     And when Poynt started working with Innowi, Poynt's team found that the Innowi team was neither knowledgeable about nor experienced in numerous important payment technologies such as card readers, EMV chips, and payment processing.  Poynt also found that the Innowi team lacked expertise with near field communication ("NFC") technology and with the governing industry standards—including the Payment Card Industry Data Security Standard ("PCI DSS"), Payment Card Industry PIN Transaction Security ("PCI PTS") and EMV standard—and lacked knowledge of how to navigate the design constraints those standards imposed.

19.     During the Development Agreement project, Poynt disclosed and Innowi obtained access to Poynt's source code repositories, internal development information repositories and industry expertise.  Indeed, over the course of the Development Project, Innowi had access to an enormous amount of Poynt's confidential technical and business information, including:

- the assembly bill of materials and component data sheets for Poynt's terminals;
- Poynt's product requirement documentation;

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

- proposed, in-development and final design files including those showing mechanical design (including 3D mechanical designs), schematics, and printed circuit board designs;

- source code and source code design for Poynt's proprietary terminal operating system, including kernel and boot-loader code;

- source code and source code design for firmware, drivers and APIs;

- lists of open issues regarding the development of the Poynt terminal;

- lists and contact information for Poynt's suppliers, vendors and other service providers; and

- the hardware designs, work product, design dead ends and other non-public information that Innowi created while performing its work under the Development Agreement.

20.     It is a well-known and universally accepted principle of the design manufacturer contracting industry that contractors will not use or disclose a client's confidential information and that the client will own **all** of the intellectual property derived from the client's development project.  This principle is fundamental to the industry because – without it – clients would not trust contractors with their business plans and technology.  Poynt and Whizz/Innowi were both well aware of this custom and practice and both demonstrated their understanding of its applicability during the Development Project.  For example, the work product that Innowi provided to Poynt frequently included confidentiality markings designating the material "proprietary and confidential."

21.     In addition to requiring confidentiality prior to sharing its information, Poynt takes many other measures to protect its confidential technical and business information.  Poynt's building can and at all relevant times could only be entered with a badge, and Poynt's offices within that building cannot and could not be entered without an individually-assigned PIN code. Poynt has and does monitor the site with video cameras.  Poynt's computers are and were protected by a network firewall and cannot and could not be accessed without entering an individual-assigned login.  Poynt's source code and development repositories cannot and could

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

not be accessed without submitting two-factor authentication.  And access to such sensitive data is limited to only engineers and necessary contractors operating under non-disclosure agreements.

22.     Poynt's employees are also required to abide by detailed Security & Information Technology Policies and Procedures.  Because Poynt's products handle cardholder information, compliance with these security requirements is necessary to Poynt's Payment Card Industry ("PCI") certification.  Poynt's robust security policies include measures that, for example, require that cabinets and storage rooms remain locked after hours, that computers be configured with a password protected screen saver, that no personal computers access the Poynt wireless network, that sensitive information be encrypted when transmitted over the internet, and several other such policies.  Compliance with these policies is regularly audited, and failure to comply results in discipline, potentially including termination.

**B.      Innowi Breaches the Agreements and Misappropriates Poynt's Trade Secrets**

23.     During the Development Agreement project, Poynt paid Innowi over $700,000. After Innowi missed or pushed back multiple deadlines, the prototype Innowi submitted to Poynt was very unstable.  Further, Innowi communicated to Poynt that it would be unable to meet the Development Agreement's cost requirements, instead asserting that the manufacturing cost of the payment terminal hardware would be more than five times as expensive as the parties had agreed.

24.     As a result of Innowi's failures, in December 2014, Poynt exercised its right to terminate the Development Agreement and transitioned the payment terminal design manufacturing project to another contractor.  To facilitate the separation, Poynt sent Innowi a list of outstanding tasks, and a proposed termination agreement.  This proposed termination agreement contained quit-claim provisions assigning to Poynt all intellectual property related to the Development Project, as required by the Development Agreement.  Poynt also demanded that all Poynt property be returned and that all Poynt confidential information be returned or destroyed.  A copy of the draft termination agreement will be filed under seal as **Exhibit C**.

25.     The process of terminating the relationship between Poynt and Innowi dragged into 2015.  Innowi refused to execute the proposed agreement.  Instead, Innowi sent Poynt a new proposal that included a provision stating, in contradiction to the Development Agreement, that

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

Innowi would own "any know-how" relating to the Development Project.  But Innowi's draft *acknowledged* that "Innowi assumes full responsibility for Whizz's compliance with the [Development Agreement] and its confidentiality obligations to Poynt."  A copy of Innowi's draft agreement will be filed under seal as **Exhibit D**.  Ultimately, no agreement was reached.

26.     Following termination of the Development Agreement, Innowi represented that it was continuing to conduct business as a design manufacturing contractor.  Indeed, Innowi's public website continued to advertise its services as a design manufacturing contractor until as late as February 2016.

27.     But, unbeknownst to Poynt, Innowi had begun transitioning from a general design contractor focused on mobile and wireless device development for third parties to a point-of-sale payment terminal provider intent on directly competing with Poynt.  As the evidence is likely to show after a reasonable opportunity for further investigation or discovery, this transition was facilitated by Innowi's improper use of Poynt's confidential trade secrets retained by Innowi following the termination of the agreement and, over the next four years, Innowi impermissibly used Poynt's confidential information to develop a competing product.

28.     On September 9, 2015, only nine months after Poynt terminated its project with Innowi, Innowi founders Faisal Saeed, Zia Hasnain, and Asif Rao, each of whom had access to Poynt's confidential information and participated extensively in the development of Poynt's product under the Development Agreement, filed U.S. Patent Application No. 14/850/943, titled "Smart Integrated Point of Sale System."  The Innowi application discloses details about the design of Poynt's smart terminal device.  Specifically, the application discloses a smart payment terminal device that contains a secure processor utilized to process cardholder data and other sensitive payment information, and a separate main processor used to run the applications available on the smart terminal device.  This patent application is derived from Innowi's work on Poynt's Development Project and reflects inventions conceived by Poynt's own employees rather than by Innowi's employees.  Worse, illustrating Innowi's bad faith, Innowi did not disclose to the U.S. Patent Office any information about Poynt's own utility patents, Mr. Bedier's patents, or Poynt's product, despite its legal duty to disclose all prior art of which it was aware.

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

29.     In 2017, Innowi filed two additional patent applications, U.S. Patent Application Nos. 15/618,122 and 15/721,923.  Like the '943 application, the allowed claims of the '122 application recite material derived from Innowi's work on Poynt's Development Project.  The '923 application is not yet published but relates to the same subject matter and, as the evidence is likely to show after a reasonable opportunity for further investigation or discovery, also covers material derived from Innowi's work on Poynt's Development Project.

30.     Innowi never informed Poynt of its patent applications, despite the fact that the Development Agreement expressly states that all intellectual property derived as a result of Innowi's work developing Poynt's payment terminal is owned by Poynt.

31.     In or around May 2016, Poynt had learned from a customer that Innowi had told a customer that Innowi was developing its own point-of-service payment terminal product.  Innowi also falsely told the customer that Innowi had designed Poynt's payment terminal product.

32.     On or around July 20, 2016, Poynt's outside counsel sent a letter to Zia Hasnain at Innowi.  The letter explained, among other things, that Innowi is under a legal obligation to not use or disclose Poynt's confidential information, particularly to obtain a competitive advantage over Poynt.  The letter further requested that Innowi confirm that it had not used or disclosed Poynt's confidential information for any purpose.  A true and correct copy of this letter is attached hereto as **Exhibit E**.

33.     On or around August 8, 2016, Innowi's outside counsel responded to Poynt's letter and represented that "Innowi is not using or disclosing any of Poynt's confidential information or any materials based on or derived from Poynt's confidential information" and that "Innowi is not using or disclosing any confidential, proprietary, or trade secret information of Poynt developed under the [Development] Agreement."  A true and correct copy of this letter is attached hereto as **Exhibit F**.

34.     Innowi has since announced that it intends to release a competing payment terminal product called the "ChecOut M."

35.     Innowi had extensive access to Poynt's trade secret information.  Zia Hasnain, Asif Rao, Faisal Saeed each had access to Poynt's confidential information and participated

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

extensively in the development of Poynt's product under the Development Agreement.  Each of these individuals continue to serve in executive positions at Innowi.  The evidence is likely to show after a reasonable opportunity for further investigation or discovery that Messrs. Hasnain, Rao and Saeed were executives at Innowi at all relevant periods during the company's development of the ChecOut M product and the company's transition from contract manufacturer to point-of-sale payment terminal producer.

36.     The evidence is also likely to show after a reasonable opportunity for further investigation or discovery that Innowi improperly used Poynt's confidential information related to the Development Project to advance its own development of a competing product.  Indeed, even a simple comparison of the two companies' development timelines strongly suggests that Innowi has made use of Poynt's confidential information.   Poynt was founded in 2013 by Osama Bedier, a payment technology veteran who led Google Wallet and payments division at PayPal.  Much of Mr. Bedier's team at Poynt has similarly specialized experience in engineering, product development and the financial technology industry.  But even with Poynt's specialized team and singular focus, it took them a little over 1 year to develop a prototype for the Poynt Smart Terminal.

37.     By contrast, the Innowi team is significantly smaller and (prior to the Development Project) had no significant experience in the financial technology field generally or with the payments industry specifically.  Nor was Innowi familiar with the exacting industry standards or the techniques required to create a commercially viable product that could be certified under those standards.  Despite these severe disadvantages, the Innowi team produced a working specimen of its product only, at most, 8 months slower than Poynt, and that assumes the Innowi team worked diligently towards their prototype as soon as Poynt terminated the Development Agreement.  The evidence is likely to show after a reasonable opportunity for further investigation or discovery that Innowi could not have developed its product so quickly without misappropriating Poynt's trade secrets or breaching the Development Agreement.

38.     Innowi's use of Poynt's intellectual property has given Innowi a head start in developing a product that will reach the market alongside Poynt's products and which are

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

designed to compete directly with Poynt's products.  Innowi's unfair head start has been harmful to Poynt including through the loss of market share.  As a result of Innowi's breaches of its agreements with Poynt and Innowi's misappropriation of Poynt's trade secrets, Poynt is now being forced to compete against a product unfairly developed with the benefit of Poynt's investments in its own trade secrets.

### First Cause of Action – Breach of the Non-Disclosure Agreement

39.    Poynt realleges and incorporates by reference Paragraphs 1 through 38, inclusive, of this Complaint, as though fully set forth herein.

40.    In March 2014, Poynt and Whizz executed a Mutual Non-Disclosure Agreement ("NDA"), a copy of which is attached as **Exhibit A**.  The NDA was willingly agreed to by both parties without duress or undue influence and is valid and enforceable.

41.    Pursuant to the NDA, each party's confidential business and technical information was to be maintained in strict confidence for a period of at least 5 years, and not used for any purpose except for the mutual business opportunity.  **Ex. A ¶ 2**.

42.     The NDA provides that "Upon the disclosing party's request, the receiving party will promptly return to the disclosing party all tangible items and embodiments containing or consisting of the disclosing party's Confidential Information and all copies thereof (including electronic copies) and provide the disclosing party with a written officer's certificate certifying the receiving party's compliance with the foregoing obligation." **Ex. A ¶ 4**.

43.    The NDA further provides that "Each party acknowledges that the unauthorized use or disclosure of the disclosing party's Confidential Information would cause the disclosing party to incur irreparable harm and significant damages, the degree of which may be difficult to ascertain.  Accordingly, each party agrees that the disclosing party will have the right to obtain immediate equitable relief to enjoin any unauthorized use or disclosure of its Confidential Information, in addition to any other rights and remedies that it may have at law or otherwise." **Ex. A ¶ 7**.

44.    The NDA remains in effect and shall not terminate until five years after the date of the last disclosure of confidential information by either party.  **Ex. A ¶ 9**.

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

45.     During negotiation of the NDA, Whizz indicated that the team that would be working on Poynt's Development Project would be affiliated with Whizz.  The founders of Innowi also made numerous representations indicating that they were affiliated with Whizz, including by using Whizz email addresses and using Whizz branding on their documents.  As the evidence is likely to show after a reasonable opportunity for further investigation or discovery Innowi is an alter ego to Whizz under the NDA, is not entitled to separate legal status under the NDA and is obligated by the provisions of the NDA.

46.     Alternatively, as the evidence is likely to show after a reasonable opportunity for further investigation or discovery, Whizz expressly or impliedly assigned its rights and obligations under the NDA to Innowi and Innowi assumed all rights and obligations under the NDA from Whizz.

47.     Poynt performed its obligations under the NDA, including but not limited to maintaining Whizz's and Innowi's confidential information, or was excused from performance of certain obligations by reason of Whizz and Innowi's breach.

48.     During the business opportunity, Poynt disclosed to Whizz and Innowi numerous pieces of Poynt's confidential information including, at minimum, Poynt's design requirement documentation, operating system source code, and lists of Poynt's development-related suppliers and vendors.  Innowi also developed confidential information for Poynt as part of the Development project including, for example, hardware schematics.

49.     While Innowi's obligations were in full force and effect, Innowi breached the NDA by, as the evidence is likely to show after a reasonable opportunity for further investigation or discovery, using Poynt's confidential information for improper purposes unrelated to the business opportunity, including for the purposes of obtaining a patent and developing a competing product and business.

50.     As a result of Innowi's breaches, the security and confidentiality of Poynt's confidential information has been compromised and Poynt has been put in the position of competing with a business whose product was developed with unfair advantages resulting from

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

1  Innowi's improper use of and reliance on Poynt's investment in its own confidential and propriety

2  information, causing Poynt to suffer damages in an amount to be determined at trial.

3       51.     As expressly agreed in the NDA, the unauthorized use and disclosure of Poynt's

4  confidential information has and will continue to cause Poynt to suffer irreparable harm.  This

5  irreparable harm includes loss of secrecy.  Further, if Poynt's merchants elect to install Innowi's

6  product rather than Poynt's, economic and time costs make it unlikely that the merchant will

7  replace its payment terminal infrastructure, leading to irreparable harm through the lasting

8  deprivation to Poynt of valuable business opportunities and market share.  These lost

9  opportunities may further cause irreparable harm by limiting Poynt's exposure in the industry and

10  thus stifling the momentum of the industry's adoption of Poynt's products and software platform.

11  Poynt is accordingly entitled to injunctive relief barring Innowi's unauthorized use of Poynt's

12  confidential information.  **Ex. A ¶ 7.**

13          **<u>Second Cause of Action – Breach of the Development Agreement</u>**

14       52.     Poynt hereby realleges and incorporates by reference Paragraphs 1 through 51,

15  inclusive, of this Complaint, as though fully set forth herein.

16       53.     On June 2, 2015, Poynt and Innowi executed the Development Agreement.  The

17  Development Agreement was willingly agreed to by the parties without duress or undue influence

18  and is valid and enforceable.  The Development Agreement is a writing signed by both Innowi

19  and Poynt.  The Development Agreement was reasonable and supported by adequate

20  consideration in that Poynt promisesd to pay Innowi for its services and Innowi promised, among

21  other things, to provide those services.  Both Poynt and Innowi also had mutuality of remedies

22  under the contract to enforce these promises, as Poynt owed Innowi obligations including

23  obligations to pay Innowi, to continue to use Innowi as primary manufacturer, and to support

24  Innowi's work with relevant subject matter experts.

25       54.     The Development Agreement provided that Poynt was to own all intellectual

26  property associated with and derived as a result of the Development Agreement project.  This

27  unqualified provision is sufficiently definite so as to permit a court to know that an attempt to

28

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

claim ownership of such intellectual property would constitute a breach that could be enforced through equity.

55.     Poynt performed its obligations under the Development Agreement, including by paying over $700,000 to Innowi for services, materials, and parts, or was excused from performance of certain obligations by reason of Innowi's breaches (including its failure to timely deliver and/or to meet the cost targets in the agreement).

56.     While Innowi's obligations were in full force and effect, Innowi breached the Development Agreement by submitting several U.S. patent applications on alleged inventions that properly are owned by Poynt under the Development Agreement.  As the evidence is likely to show after a reasonable opportunity for further investigation or discovery, the alleged invention disclosed and claimed in this patent application was derived as a result of the Development Agreement project, which had only ended nine months before the first patent application was submitted.  Innowi further breached by making use of trade secrets that contractually belong to Poynt.

57.     As a result of Innowi's breach, Poynt has been deprived of its rightful intellectual property rights and parts of Poynt's confidential information has been disclosed, causing Poynt to suffer damages in an amount to be determined at trial.

58.     Should Innowi be issued patents that are based on Poynt's product development and contractually owed to Poynt, Poynt will be irreparably harmed by the loss of exclusive rights in its properly owned intellectual property, and by being forced to compete against a company that claims exclusive rights in Poynt's products and/or limits Poynt's ability to expand the features and functionalities of its products.  Poynt is therefore entitled to equitable relief preventing Innowi from retaining ownership of intellectual property rights that it promised to Poynt and further mandating the assignment of Innowi's U.S. patent applications to Poynt.  Such an order of specific performance is substantially similar to the promise Innowi already made in the Development agreement acknowledging that Poynt was to own all intellectual property derived from the Development Project.

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

### Third Cause of Action – Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act

59.     Poynt hereby realleges and incorporates by reference Paragraphs 1 through 58, inclusive, of this Complaint, as though fully set forth herein.

60.     Poynt invested substantial resources in developing design documentations for its developing product, including assembly bills of materials, component data sheets, mechanical design files (including 3D designs), schematics, and printed circuit board designs.  Poynt likewise invested substantial resources in developing the source code for its proprietary operating system, including kernel and bootloader code, drivers, and APIs.  Poynt also maintained and protected lists of information crucial to the development and eventual success of Poynt's product, including lists of open development issues and lists of suppliers and vendors used to source components, parts and other services necessary for Poynt's product development.

61.     Because the above-discussed confidential information is crucial to the success of its business, Poynt makes substantial efforts to keep this confidential information from its competitors and the public.

62.     Poynt has, at all relevant times, taken reasonable efforts to maintain the secrecy of this confidential information, including by imposing individualized PIN-based access to its facilities, requiring two-factor authentication on its development-related repositories, requiring its employees comply with strict, industry-mandated security policies, and ensuring its vendors and contractors working with sensitive information agree to protect Poynt's confidential information.

63.     The efforts that Poynt takes are reasonable under the circumstances to maintain the information's secrecy.  Poynt takes these measures to ensure the confidentiality of this information because this information derives independent economic value because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Poynt's competitors would obtain economic value from the use and disclosure of this information including by, for example, obtaining a "head start" as compared to the process of developing and supporting a payment terminal product and business without the improper use

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

of this information.  Accordingly, the above-described information constitutes "trade secrets" under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, *et seq.*

64.     As a design manufacturing contractor involved in the development of hardware for the Poynt Smart Terminal device, Innowi acquired knowledge and custody of several of Poynt's trade secrets and developed trade secrets (both positive and negative) that belonged to Poynt under the terms of the Development Agreement.

65.     Innowi was contractually obligated to maintain the secrecy of those trade secrets and to limit their use pursuant to the NDA.  Innowi further knew or had reason to know that its knowledge of Poynt's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of those trade secrets or limit their use – including because (a) the NDA expressly said that Poynt's confidential and trade secret information would be protected; (b) the Development Agreement is expressly labeled as Confidential; (c) the Development Agreement expressly says that Poynt owns all "Intellectual Property" associated with the Development Project, which includes trade secrets and therefore requires maintaining their confidentiality; (d) it is understood in the contract development business that was Innowi's main business that a client's information is and must be protected (e) during the course of performance of the Development Project both sides acted in conformity with their agreement and understanding that Poynt's confidential information and intellectual property would be protected; and (f) even following the termination of the Development Agreement, Innowi recognized its obligation not to use or disclose Poynt's information in its response to Poynt's demand letter and in its draft termination agreement.

66.     Innowi misappropriated Poynt's trade secrets by improperly using Poynt's trade secrets to develop and market a competing product and by disclosing Poynt's trade secrets to others without authorization.

67.     The actions of Innowi constitute misappropriation of Poynt's trade secrets under Cal. Civ. Code §§ 3426, *et seq.*

68.     Because Innowi knew of Poynt's ownership of trade secrets and nonetheless acted in knowing disregard of those rights by making unauthorized use of Poynt's trade secrets to

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

develop a competing product, Innowi's acts of misappropriation were done willfully and maliciously, thereby entitling Poynt to attorneys' fees and exemplary damages to be proved at trial pursuant to Cal. Civ. Code §§ 3426.4, 3426.3(c).

69.     As a direct and proximate cause of Innowi's misappropriation of Poynt's trade secrets, the evidence is likely to show after a reasonable opportunity for further investigation and discovery that Innowi has been unjustly enriched at least by the amount(s) Innowi has received for pre-orders, has obtained a substantial head start, and Poynt has sustained damages in an amount to be proven at trial.  Poynt has also suffered irreparable harm as a result of Innowi's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Innowi and all other persons acting in concert with it are enjoined from engaging in any further such acts of misappropriation.  This irreparable harm includes loss of secrecy, the loss of market share, and the loss or impairment of business opportunities.  Indeed, if Poynt's actual and potential merchant customers elect to install Innowi's product rather than Poynt's, economic and time costs make it unlikely that a customer will replace its payment terminal infrastructure, leading to irreparable harm through the lasting deprivation to Poynt of valuable business opportunities and market share.  Because Poynt's products are still new to the market, these lost opportunities may further cause irreparable harm by limiting Poynt's exposure in the industry and thus stifling the momentum of the industry's adoption of Poynt's products and software platform.

**Fourth Cause of Action – Misappropriation of Trade Secrets Under Federal Law**

70.     Poynt hereby realleges and incorporates by reference Paragraphs 1 through 69, inclusive, of this Complaint, as though fully set forth herein.

71.     Poynt invested substantial resources in developing design documentations for its developing product, including assembly bills of materials, component data sheets, mechanical design files (including 3D designs), schematics, and printed circuit board designs.  Poynt likewise invested substantial resources in developing the source code for its proprietary operating system, including kernel and bootloader code, drivers, and APIs.  Poynt also maintained and protected lists of information crucial to the development and eventual success of Poynt's product, including

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

lists of open development issues and lists of suppliers and vendors used to source components, parts and other services necessary for Poynt's product development.

72.     Because the above-discussed confidential information is crucial to the success of its business, Poynt makes substantial efforts to keep this confidential information from its competitors and the public.

73.     Poynt has, at all relevant times, taken reasonable efforts to maintain the secrecy of this confidential information, including by imposing individualized PIN-based access to its facilities, requiring two-factor authentication on its development-related repositories, requiring its employees comply with strict, industry-mandated security policies, and ensuring its vendors and contractors working with sensitive information agree to protect Poynt's confidential information.

74.     The efforts that Poynt takes are reasonable under the circumstances to maintain the secrecy of the information.  Poynt takes these measures to ensure the confidentiality of this information because this information derives independent economic value because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Poynt's competitors would obtain economic value from the use and disclosure of this information including by, for example obtaining a "head start" as compared to the process of developing and supporting a payment terminal product and business without the improper use of this information.  Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*

75.     As a design manufacturing contractor involved in the development of hardware for the Poynt Smart Terminal device, Innowi acquired knowledge and custody of several of Poynt's trade secrets and developed trade secrets (both positive and negative) that belonged to Poynt under the terms of the Development Agreement.

76.     Innowi was contractually obligated to maintain the secrecy of those trade secrets and to limit their use pursuant to the NDA.  Innowi further knew or had reason to know that its knowledge of Poynt's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of those trade secrets or limit their use – including because (a) the NDA expressly said that Poynt's confidential and trade secret information would be protected; (b) the

Development Agreement is expressly labeled as Confidential; (c) the Development Agreement expressly says that Poynt owns all "Intellectual Property" associated with the Development Project, which includes trade secrets and therefore requires maintaining their confidentiality; (d) it is understood in the contract development business that was Innowi's main business that a client's information is and must be protected (e) during the course of performance of the Development Project both sides acted in conformity with their agreement and understanding that Poynt's confidential information and intellectual property would be protected; and (f) even following the termination of the Development Agreement, Innowi recognized its obligation not to use or disclose Poynt's information in its response to Poynt's demand letter and in its draft termination agreement.

77.     Innowi misappropriated Poynt's trade secrets by improperly using Poynt's trade secrets to develop and market a competing product and by disclosing Poynt's trade secrets without authorization.

78.     The misappropriated trade secrets relate to products and services used in, or intended for use in, interstate or foreign commerce.  Poynt's products made with the benefit of the trade secrets are sold in numerous states and countries.  As the evidence is likely to show after a reasonable opportunity for further investigation or discovery, Innowi plans to sell its product developed with the benefit of Poynt's trade secrets in several states and in foreign countries.

79.     The actions of Innowi constitute misappropriation of Poynt's trade secrets under 18 U.S.C. § 1836, *et seq.*

80.     Because Innowi knew of Poynt's ownership of trade secrets and nonetheless acted in knowing disregard of those rights by making unauthorized use of Poynt's trade secrets to develop a competing product, Innowi's acts of misappropriation were done willfully and maliciously, thereby entitling Poynt to attorneys' fees and exemplary damages to be proved at trial pursuant to 18 U.S.C. §§ 1836(b)(3)(c)-(d).

81.     As a direct and proximate cause of Innowi's misappropriation of Poynt's trade secrets, the evidence is likely to show after a reasonable opportunity for further investigation and discovery that Innowi has been unjustly enriched at least by the amount(s) Innowi has received

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

for pre-orders, has obtained a substantial head start, and Poynt has sustained damages in an amount to be proven at trial.  Poynt has also suffered irreparable harm as a result of Innowi's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Innowi and all other persons acting in concert with it are enjoined from engaging in any further such acts of misappropriation.  This irreparable harm includes loss of secrecy, the loss of market share, and the loss or impairment of business opportunities.  Indeed, if Poynt's actual and potential merchant customers elect to install Innowi's product rather than Poynt's, economic and time costs make it unlikely that a customer will replace its payment terminal infrastructure, leading to irreparable harm through the lasting deprivation to Poynt of valuable business opportunities and market share.  Because Poynt's products are still new to the market, these lost opportunities may further cause irreparable harm by limiting Poynt's exposure in the industry and thus stifling the momentum of the industry's adoption of Poynt's products and software platform.

## IV.  PRAYER FOR RELIEF

82.  WHEREFORE, Poynt respectfully requests that the Court enter judgment against Innowi as follows:

    a.  that Poynt be awarded compensatory damages for actual loss and unjust enrichment caused by the misappropriation of Poynt's trade secret information, including by ordering Innowi to disgorge the full value of the head start it received;

    b.  that the Court award exemplary damages equal to two times the amount of compensatory damages awarded for trade secret misappropriation;

    c.  that the Court issue a preliminary and permanent injunction (i) prohibiting Innowi from using, accessing, disclosing or continuing to possess Poynt's trade secret information and (ii) ordering the return of Poynt's trade secret and confidential information and all intellectual property associated with and developed pursuant to the Development Agreement;

    d.  that the Court find Innowi liable for damages caused by the Innowi's breach of the NDA;

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

e.  that the Court award Poynt damages and unjust enrichment caused by Innowi's breach of the Development Agreement;

f.  that the Court order Innowi's patent applications be assigned to Poynt as required by the Development Agreement;

g.  that the Court order an accounting for damages through judgment and post-judgment until Innowi is permanently enjoined from further damaging activities;

h.  that the Court award Poynt all damages caused by Innowi's unlawful actions;

i.  that the Court award Poynt its reasonable attorneys' fees and costs;

j.  that the Court award Poynt pre-judgment interest and post-judgment interest at the maximum rate allowed by law, including an award of prejudgment interest, pursuant to 25 U.S.C. § 284, from the date of harms to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law; and

k.  that the Court grant Poynt all other relief to which it is entitled and such other additional relief as is just and proper.

## V.   DEMAND FOR JURY TRIAL

Poynt hereby demands a trial by jury in this action.

Dated: September 21, 2018                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                    By:  _____ */s/ Clement Seth Roberts* _____
                                              CLEMENT SETH ROBERTS
                                              JACOB M. HEATH
                                              WILL MELEHANI
                                              JOHANNA L. JACOB
                                         Attorneys for Plaintiff Poynt Corporation

4126-6508-0087

COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF
CASE NO. _____

# EXHIBIT A

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement (this "*Agreement*") is made as of the _20_____ day of __March_____, _2014_, between Poynt Co., a Delaware corporation, whose address is 260 Homer ave, Suite 201, Palo Alto, CA 94301, and __Whizz Systems, Inc.____, a __CA_____ (corporation or individual), whose address is _3240 Scott Blvd, Santa Clara, CA 95054_____ .

The above named parties desire to begin discussions regarding a business opportunity of mutual interest (the "*Business Purpose*"). In connection with such discussions, the parties recognize that there is a need to disclose to each other certain confidential information to be used only for the Business Purpose and to protect such confidential information from unauthorized use and disclosure.

In consideration of the other party's disclosure of such confidential information, each party agrees as follows:

1.      For purposes of this Agreement, "*Confidential Information*" means any technical or business information disclosed by one party to the other party that: (i) if disclosed in writing, is marked "confidential" or "proprietary" at the time of such disclosure; (ii) if disclosed orally, is identified as "confidential" or "proprietary" at the time of such disclosure, and is summarized in a writing sent by the disclosing party to the receiving party within thirty (30) days after any such disclosure; or (iii) under the circumstances, a person exercising reasonable business judgment would understand to be confidential or proprietary.

2.      Each party agrees: (i) to maintain the other party's Confidential Information in strict confidence; (ii) not to disclose such Confidential Information to any third parties; and (iii) not to use any such Confidential Information for any purpose except for the Business Purpose. Each party may disclose the Confidential Information of the other party to its employees and consultants who have a bona fide need to know such Confidential Information for the Business Purpose, but solely to the extent necessary to pursue the Business Purpose and for no other purpose; provided that each such employee and consultant first executes a written agreement (or is otherwise already bound by a written agreement) that contains use and nondisclosure restrictions at least as protective of the other party's Confidential Information as those set forth in this Agreement. The provisions of this Section 2 will not restrict a party from disclosing the other party's Confidential Information to the extent required by any law or regulation; provided that the party required to make such a disclosure uses reasonable efforts to give the other party reasonable advance notice of such required disclosure in order to enable the other party to prevent or limit such disclosure.

3.      The receiving party's obligations in Section 2 will not apply to the extent any Confidential Information:

(i)      is now or hereafter becomes generally known or available to the public, through no act or omission on the part of the receiving party;

(ii)     was known, without restriction as to use or disclosure, by the receiving party prior to receiving such information from the disclosing party;

1

(iii) is rightfully acquired by the receiving party from a third party who has the right to disclose it and who provides it without restriction as to use or disclosure; or

(iv) is independently developed by the receiving party without access to any Confidential Information of the disclosing party.

4. Upon the disclosing party's request, the receiving party will promptly return to the disclosing party all tangible items and embodiments containing or consisting of the disclosing party's Confidential Information and all copies thereof (including electronic copies) and provide the disclosing party with a written officer's certificate certifying the receiving party's compliance with the foregoing obligation.

5. All Confidential Information remains the sole and exclusive property of the disclosing party. Each party acknowledges and agrees that nothing in this Agreement will be construed as granting any rights to the receiving party, by license or otherwise, in or to any Confidential Information of the disclosing party, or any patent, copyright or other intellectual property or proprietary rights of the disclosing party, except as specified in this Agreement.

6. ALL CONFIDENTIAL INFORMATION IS PROVIDED BY THE DISCLOSING PARTY "AS IS."

7. Each party acknowledges that the unauthorized use or disclosure of the disclosing party's Confidential Information would cause the disclosing party to incur irreparable harm and significant damages, the degree of which may be difficult to ascertain. Accordingly, each party agrees that the disclosing party will have the right to obtain immediate equitable relief to enjoin any unauthorized use or disclosure of its Confidential Information, in addition to any other rights and remedies that it may have at law or otherwise.

8. This Agreement will be construed, interpreted, and applied in accordance with the internal laws of the State of California (excluding its body of law controlling conflicts of law). This Agreement is the complete and exclusive statement regarding the subject matter of this Agreement and supersedes all prior agreements, understandings and communications, oral or written, between the parties regarding the subject matter of this Agreement. Neither party may assign this Agreement, in whole or in part, without the other party's prior written consent, and any attempted assignment without such consent will be void.

9. This Agreement will commence on the date first set forth above and will remain in effect for five (5) years from the date of the last disclosure of Confidential Information by either party, at which time it will terminate.

[SIGNATURE PAGE FOLLOWS]

2

**IN WITNESS WHEREOF,** the parties hereto have executed this Mutual Non-Disclosure Agreement by their duly authorized officers or representatives as of the date first set forth above.

**POYNT CO.:**                                  **COMPANY or INDIVIDUAL:**

Signature: _____            Signature: _____

Name: _____R Hernandez_____              Name: _____Muhammad Irfan_____

Title: _____VP_____            Title: _____President_____

[SIGNATURE PAGE TO POYNT CO. MUTUAL NON-DISCLOSURE AGREEMENT]

# EXHIBIT B

**SOUGHT TO BE SEALED IN ITS ENTIRETY**

# EXHIBIT C

**SOUGHT TO BE SEALED IN ITS ENTIRETY**

# EXHIBIT D

**SOUGHT TO BE SEALED IN ITS ENTIRETY**

# EXHIBIT E



SILICON VALLEY
ANN ARBOR
BEIJING
BOSTON
LOS ANGELES
NEW YORK
SAN DIEGO
SAN FRANCISCO

July 20, 2016

**VIA EMAIL & FEDEX**

Innowi Inc.
Attn: Zia Hasnain
Chief Executive Officer
3240 Scott Blvd.
Santa Clara, CA 95054

**RE: Your Continuing Legal Obligations to Poynt Co.**

Dear Mr. Hasnain:

Our firm represents Poynt Co. (the "Company"). We are writing (i) to remind you of your continuing legal obligations to the Company, (ii) to warn you of the consequences if you violate any such obligations, (iii) to demand that you not use or disclose any of the Company's confidential information or derivatives thereof, and (iv) to demand that you cease using or disclosing the Company's name, trademark, and/or any reference to your relationship with the Company. Violations of these obligations or improper use or disclosure of the Company's confidential information can expose you, as well as anyone who induces or aides and abets you, to liability pursuant to trademark and copyright infringement claims as well as various state and federal laws of the United States, including without limitation the California Uniform Trade Secrets Act and California Unfair Competition Law.

*The Agreement*

You signed a confidential business terms sheet agreement, dated June 2, 2014 (the "Agreement), which obligates you to (i) keep the Agreement confidential and (ii) assign the Company "all IP associated with and derived as a result of this project". During your performance under the Agreement, you were given access to the Company's confidential information, which included (without limitation) information about the Company's technology, its business plans, as well as information and materials based on and derived from the Company's confidential information. The Company has reason to believe that you may be misusing such confidential information.

The value of this confidential information is derived from it not being known outside of the Company and its service providers. As such, maintaining the confidentiality of this confidential information is important to the Company. As part of the Company's continuing efforts to protect its confidential information, this letter is meant to put you on notice that you may not use or disclose any of the Company's confidential information, or any information and materials based on and derived from the Company's confidential information, in any of your current or future endeavors.

In addition to the obligations you owe the Company under the Agreement, any confidential, proprietary, and trade secret information of the Company (e.g., information developed pursuant to the Agreement) is the property of the Company and cannot legally be used or disclosed by you to the competitive disadvantage of the Company.

Zia Hasnain
July 20, 2016
Page 2

We expect that you will abide by the law and your obligations to the Company and, if you are currently in violation of such obligations, immediately cease any such activities. The Company intends to diligently monitor your compliance and, should it learn that you are in violation of your obligations, it reserves the right to take any and all measures (at law and in equity) against your company necessary to protect the Company's rights and itself from economic harm, including the right to recover the full amount of its damages resulting from your actions.

### Company's Name and Trademark

Also, it has come to the Company's attention that: (i) you are referencing the Company's name, trademarks, and your relationship to the Company in your business pursuits; and (ii) you may be interfering with the Company's business relations by making unsubstantiated claims about the Company's products and services. As such, the Company demands that you immediately cease and desist any use of the Company's name, trademarks, and/or your relationship with the Company.

### Written Confirmation

No later than July 25th, 2016, the Company requires that you provide it with written confirmation of: (i) your understanding of these matters; (ii) you having not used or disclosed the Company's confidential information for any purpose; (iii) your willingness and intent to comply with the Agreement and applicable laws; and (iv) your assurance that you will cease using the Company's name, trademarks, or any reference to your relationship with the Company and will cease making unsubstantiated claims about the Company's products and services.

You may contact me directly by return mail, by email at jbirbach@gunder.com, or by phone at 1-650-463-5492. This correspondence should not be construed as a waiver of rights, an offer of settlement or reliance on any specific facts or legal theories. The Company reserves all of its rights and remedies under applicable law.

Sincerely,

Jesse Birbach

Cc: Osama Bedier

# EXHIBIT F



### INVENTUS LAW
The Global Technology Law Firm

2600 El Camino Real, Suite 415 | Palo Alto, CA 94306 | tel 650.843.0988 | fax 650.618.0488

August 8, 2016

Christopher L. Tinen
650.843.0988
christopher@inventuslaw.com

**VIA EMAIL ONLY**

Jesse Birbach
Gunderson Dettmer
jbirbach@gunder.com

Dear Mr. Birbach:

As you know, our firm is legal counsel to Innowi Inc. ("Innowi"). Please let this correspondence serve as a response to your letter of July 20, 2016 sent on behalf of Poynt Co. ("Poynt").

On behalf of Innowi, we can confirm the following:

- Innowi is not using or disclosing any of Poynt's confidential information or any materials based on or derived from Poynt's confidential information.

- Innowi is not using or disclosing any confidential, proprietary, or trade secret information of Poynt developed under the Agreement.

- Innowi will cease and desist the use or reference, if any, of the Company's name, trademarks or relationship with Poynt in connection with its business.

- Innowi denies interfering with Poynt's business relations

If you have any further questions, please do not hesitate to contact me directly.

Nothing in this correspondence shall be construed as a waiver of rights, an offer of settlement or reliance on any specific facts or legal theories. Innowi reserves all of its rights and remedies available under applicable law.

Very truly yours,

DocuSigned by:

FB5981270BDB4AE...

Christopher L. Tinen
Inventus Law, Inc.