1  CLEMENT SETH ROBERTS (SBN 209203)
   croberts@orrick.com
2  JACOB M. HEATH (SBN 238959)
   jheath@orrick.com
3  WILL MELEHANI (SBN 285916)
   wmelehani@orrick.com
4  JOHANNA L. JACOB (SBN 286796)
   jjacob@orrick.com
5  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
6  San Francisco, CA  94105
   Telephone:    +1-415-773-5700
7  Facsimile:    +1-415-773-5759

8  Attorneys for Plaintiff
   POYNT CORPORATION

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14  POYNT CORPORATION,                 | Case No. 5:18-cv-05814 BLF

15              Plaintiff,             | **FIRST AMENDED COMPLAINT FOR**
                                        | **DAMAGES AND EQUITABLE RELIEF**
16       v.
                                        | **DEMAND FOR JURY TRIAL**
17  INNOWI, INC.,
                                        | Judge:  Hon. Beth L. Freeman
18              Defendant.

19

20         Plaintiff Poynt Corporation, by and through its undersigned attorneys, brings this action

21  against Innowi, Inc. and alleges as follows:

22                          I.      **PARTIES**

23         1.      Plaintiff Poynt Corporation ("Poynt") is a Delaware corporation with a principal

24  place of business at 4151 Middlefield Rd., 2nd Floor, Palo Alto, California 94303.

25         2.      Defendant Innowi, Inc. ("Innowi") is a California corporation with a principal

26  place of business at 3240 Scott Blvd., Santa Clara, California 95054.

27

28

## II.    JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over Poynt's claims pursuant to 28 U.S.C. §§ 1331, and the trade secret laws of the United States, 18 U.S.C. §§ 1836 and 1839, *et seq*.  The Court possesses supplemental jurisdiction over Poynt's state law claims under 28 U.S.C. § 1367(a) because Poynt's federal and state law claims derive from a common nucleus of operative fact as set forth herein.

4.     This Court has general personal jurisdiction over Innowi because Innowi has systematic and continuous contacts with the State of California such that California is its "home" jurisdiction.  In particular, Innowi is incorporated in California, and has a principal place of business in Santa Clara, California.

5.     This Court has specific personal jurisdiction over Innowi because, as explained below, Poynt's causes of action arise directly from Innowi's activities in the State of California and in this judicial district.  In particular, (a) the agreements protecting Poynt's confidential information and intellectual property were executed and violated in this district, and (b) the trade secrets at issue in this case were developed and misappropriated here.

6.     Venue for Innowi is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Innowi resides in this district and, as explained elsewhere herein, a substantial part of the events and omissions giving rise to Poynt's claims occurred in this judicial district.

## III.    FACTUAL BACKGROUND

7.     Poynt sells industry-leading smart point-of-sale payment terminal products. Poynt's products include the Poynt Smart Terminal, which is the world's first smart terminal. The Poynt Smart Terminal creates an impeccable payments experience for merchants and customers by combining the robust functionalities of a mobile computer with the security and reliability of a traditional payment device.  Poynt also produces the Poynt 5, a mobile, single-screen, point-of-sale terminal solution that provides merchants with greater flexibility to bring the terminal to the customer.

8.      In addition to offering physical point-of-sale payment terminals, Poynt offers an array of software applications, available for use on Poynt's devices, that are designed to help businesses better navigate and organize their sales and inventory activities.

A.      **The Development Agreements and Development Project**

9.      Poynt began developing its flagship product, the Poynt Smart Terminal, in October 2013.

10.      In or around March 2014, Poynt had progressed in developing the proprietary software that would serve as the operating system for Poynt's payment platform, and had developed design requirements for the associated hardware.  At this time, Poynt had not yet announced its product and was still in "stealth-mode."  Poynt was therefore very secretive about its activities and vigilantly protected information about its business with non-disclosure agreements.

11.      In or around March 2014, Poynt was looking to hire a contract manufacturer to assist with the development of the hardware for Poynt's payment terminal product, and approached Whizz Systems, Inc. ("Whizz") based on a recommendation.  Whizz and Poynt entered into a Mutual Non-Disclosure Agreement ("NDA") dated March 20, 2014.  A copy of the NDA is attached as **Exhibit A**.

12.      After that NDA was signed,  Poynt attended a meeting at Whizz's offices, in one of Whizz's conference rooms in or around March 31, 2014.  Osama Bedier, Poynt's founder and CEO, and Robert Hernandez attended for Poynt.  At that meeting, Whizz's President, Muhammad Irfan ("Ifran"), introduced Poynt to a team of developers including Zia Hasnain ("Hasnain"), Asif Rao ("Rao"), and Faisal Saeed ("Saeed").  Irfan represented that Hasnain, Rao, Saeed and others were part of Whizz's design team, that this team would be ideal for Poynt's project and that, if Poynt were to hire Whizz, they would be the team that worked on that project.

13.      Poynt now understands that Hasnain, Rao, and Saeed were in fact officers of Innowi, Inc. ("Innowi"), but this fact was not revealed to or known to Poynt at that time.  Instead, Ifran represented that Hasnain, Rao, and Saeed were part of Whizz, and Hasnain, Rao, and Saeed did not then make any attempt to correct that representation.  Through their conduct in

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

1  participating in the meeting held at Whizz (which, based on their comments and behavior, they

2  clearly knew to be occurring under the NDA), allowing Ifran to introduce them as part of Whizz,

3  and failing to correct Ifran's representation that they were part of Whizz, Hasnain, Rao, and

4  Saeed held themselves out and represented themselves to be part of Whizz.

5        14.    Poynt's belief that Hasnain, Rao, Saeed (and the other employees of Innowi) were

6  part of Whizz was further supported (throughout the course of the parties relationship) by the fact

7  that (a) Hasnain, Rao, and Saeed and the other Innowi employees communicated with Poynt

8  using Whizz email addresses, (b) Hasnain, Rao, Saeed and the other Innowi employees worked

9  out of cubicles in Whizz's office (c) Hasnain, Rao, Saeed and the other Innowi employees

10  delivered work product (e.g. schematics) on sheets that were expressly labeled as having been

11  produced by Whizz; and (d) Ifran remained (for the duration of the parties relationship) the top

12  step in the escalation path opposite Poynt.

13        15.    At the time Poynt entered into the NDA, it had no knowledge of Innowi nor reason

14  to know of Innowi's existence – much less that Innowi was a separate legal entity.  Similarly,

15  both at this first meeting (and throughout the relationship) Poynt had no reason to know or

16  believe that an NDA was needed with any party other than Whizz.

17        16.    At the time the representations described in Paragraphs 13 and 14 were made, the

18  Whizz and Innowi attendees both reasonably should have known and actually knew that Poynt

19  would be relying on the fact that Hasnain, Rao and Saeed held themselves out and represented

20  themselves as being part of Whizz – and the fact that this (in turn) meant they were bound by the

21  NDA – to disclose Poynt's confidential and trade secret information to them.  Among other

22  things, all of the non-Poynt attendees at the meeting knew that Poynt was in stealth mode, knew

23  that they were being approached as a potential contract designer for a device that Poynt intended

24  to build, knew that in the contract design industry the contract designer is required to hold the

25  confidential and trade-secret information of its client in confidence, and knew that Poynt had

26  signed an NDA with Whizz for that purpose.  Thus, all of Hasnain, Rao and Saeed reasonably

27  should have known and actually knew that their conduct, omissions and representations that they

28  were part of Whizz would be and actually were being relied on by Poynt.

17.     Innowi (acting through its officers Hasnain, Rao and Saeed) also **_intended_** for Poynt to rely on its representations that it was part of Innowi.  In particular, as noted above, Hasnain, Rao and Saeed knew – both at the time they attended the meeting and afterwards – that Poynt had required Whizz sign an NDA before receiving confidential and trade secret information, and nonetheless attended the meeting with Poynt with the intent to receive and discuss that information.  Put differently, they made the representations described above for the purpose of getting Poynt to reveal its confidential and trade secret information both in this initial meeting and afterwards.  Further, Poynt had a right to believe that Innowi intended for Poynt to act upon its representations because Poynt reasonably believed that all people attending the meeting were covered by the NDA, and Innowi knew that Poynt was only willing to disclose confidential information to parties that were subject to an NDA.

18.     Poynt, in turn, reasonably relied on the representation made by Hasnain, Rao and Saeed both (a) agreeing to disclose confidential and trade secret information to Hasnain, Rao, Saeed (and others who, it now appears, worked for Innowi) both at this first meeting and afterwards, and (b) in not seeking to require Hasnain, Rao and Saeed to sign a separate or additional NDA expressly covering Innowi.  Put differently, had Hasnain, Rao, and Saeed not represented to Poynt that their development team (i.e. Innowi) was part of Whizz and therefore bound by the NDA, Poynt would have required (before moving forward) the entity containing the development team to agree to the same contractual protections found in the NDA it required Whizz to sign.

19.     As a result, Innowi (acting through its officers) caused injury to Poynt insofar as Innowi now insists it is not bound by the NDA.  As noted above, had Poynt known the truth, it would have required Innowi to sign the same NDA that Poynt required Whizz to sign before disclosing any confidential and trade-secret information.  Thus, insofar as Innowi asserts it is not bound by the NDA, the omissions and misrepresentations of Hasnain, Rao and Saeed damaged Poynt by depriving Poynt of the express contractual protections found in the NDA, as against Innowi.

20.     When Ifran signed the NDA, he did so on behalf of Innowi as Innowi's agent. When Ifran signed the NDA, he knew that Hasnain's team (Innowi) would be principally responsible for working on the Poynt project covered by the NDA.  At the time the NDA was signed, both Ifran and Innowi knew that Innowi was the party that would perform the work Poynt was requesting and which came to be the subject of the Development Agreement.  Ifran signed the NDA knowing that doing so was a necessary condition to progressing Innowi's negotiations with Poynt, and thus acted on behalf of Innowi.  Ifran understood that Poynt believed that Hasnain and his team would be subject to the terms of the NDA, and signed it without making any corrections – instead representing in the document that the "Whizz design team" was covered by the NDA.  As the party with the engineers who would be doing the proposed design work for Poynt, Innowi had ultimate control over whether to engage with Poynt in a business relationship, and Innowi thus had control over Ifran's/Whizz's participation in the negotiations.  Indeed, Innowi ultimately planned to lead the project with Whizz serving as on as one of Innowi's subcontractors (although this was unknown to Poynt at the time).  As the evidence is likely to show after a reasonable opportunity for further investigation or discovery, and as shown by the course of conduct described herein, Whizz had actual or implied authority from Innowi's officers to enter into the NDA on behalf of Innowi.  At minimum, Ifran was implicitly authorized to sign the NDA on behalf of Innowi.

21.     At a minimum, because Innowi's officers represented that they were part of Whizz and allowed Ifran to sign the NDA, Ifran was an ostensible agent of Innowi with apparent authority to bind Innowi to the NDA.  In executing the NDA with Whizz, both parties knew that Poynt was seeking to bind the potential design team (a.k.a. "the Whizz design team" a.k.a. Innowi) to the terms of the NDA, and Poynt reasonably relied on the appearance, created by Whizz and Innowi's officers at least in letting Ifran sign the NDA, that Whizz's execution of the NDA would bind the actual design team for whom Poynt was negotiating to hire (*i.e.* Innowi).

22.     Pursuant to the NDA, each party's confidential business and technical information was to be maintained in strict confidence and could not be used for any purpose except for the business opportunity embodied by the potential Poynt Development Project.  **Ex. A ¶ 2**.  The

NDA also required a receiving party to return the disclosing party's confidential information at the disclosing party's request and to provide the disclosing party with an officer's certificate certifying compliance.  **Ex. A ¶ 4**.  The purpose of this NDA was to protect information related to Poynt's development and to bind the party and individuals that would to be working on Poynt's Development Project.

23.     Even after Innowi's existence was revealed, Innowi held it out as being part of Whizz.  For example, on April 23, 2014, Hasnain provided a PowerPoint presentation regarding plans for the team and timeline for the project that was titled "Whizz/Innowi Inc. Poynt Tablet." As this presentation shows, Innowi was holding itself as being a brand that was part of Whizz. Poynt continued to believe that Innowi was a brand within Whizz.  Moreover, as shown by the footer at the bottom of the presentation ("Innowi Inc. Confidential"), Innowi understood that the parties had a protocol for designating information as confidential.  The only contract in place at that time, however, was the NDA, and it provided for a method of designating confidential information in the manner that Innowi had specifically made use of in this PowerPoint presentation.  *See* **Ex. A ¶ 1.**  Thus, Innowi's own conduct shows that it understood that it was both bound and protected by the NDA, and constitutes a ratification of Whizz's execution of the NDA on behalf of the intended design team (Innowi).

24.     By June 2014, Poynt reached a confidential development agreement with Innowi (the "Development Agreement") in which Innowi agreed to develop the hardware for a payment terminal product meeting Poynt's regulatory, certification, cost and design requirements (the "Development Project"), a copy of which will be filed under seal as **Exhibit B**.  The Development Agreement required that Innowi achieve pilot production for the product by December 2014 and provided that Poynt would own ***any and all*** intellectual property "associated with and derived as a result of the project."

25.     Because Whizz, Irfan, and Hasnain had all represented that Hasnain, Rao, and Saeed were part of Whizz's team, because no one at Whizz or Innowi ever suggested otherwise, and because Hasnain, Rao and Saeed used Whizz email addresses and worked in Whizz's offices, at the time Poynt entered into the Development Agreement, Poynt continued to believe that

Innowi was part of Whizz.  The Development Agreement was thus drafted as an agreement between Poynt and Whizz that expressly called for the Hasnain-led development team to do the work.

26.     On or around June 2, 2014, Hasnain signed the Development Agreement, purportedly on behalf of Whizz, but then also handwrote in the signature block to indicate that he was also signing the Development Agreement on behalf of Innowi.  Hasnain did not attempt to edit the terms of the Development Agreement to clarify that Innowi, rather than Whizz, was the contracting party.  Instead, he signed for both Whizz and Innowi.  In so doing, he continued to hold himself (and the rest of the Innowi team) as being part of Whizz and to bind Innowi to the terms of the contract, including those that are expressly directed to Whizz.  Put differently, insofar as Innowi is and was a separate entity and not part of Whizz, Hasnain's actions in signing the Development Agreement without revealing that Innowi was a separate entity was both an affirmative representation that Innowi would be bound by the terms of the contract (on the same terms and conditions as Whizz) and an omission of material facts (*i.e.* the fact that Innowi was a separate entity).

27.     Insofar as now Innowi claims that terms in the Development Agreement pertaining to Whizz are not binding on it, Poynt relied on Hasnain's representations, omissions and conduct (as well as the other representations discussed above), all of which indicated that Innowi was part of Whizz and therefore bound the by the terms of the Development Agreement pertaining to Whizz.  Hasnain knew that Innowi was not part of Whizz, and knew (from the terms of the Development Agreement) that Poynt had been led to believe that Innowi was part of Whizz. Poynt relied on Hasnain's representations to its determinant because, had Poynt known that Innowi was not part of Whizz, Poynt would not have entered into the Development Agreement without clarifying (on a line by line basis) that the provisions of the Development Agreement were binding on Innowi.  Put differently, had Hasnain not mislead Poynt into believing that Whizz and Innowi were part of a single entity, Poynt would not have signed the Development Agreement without clarifying (on a provision by provision basis) that Innowi was bound by each

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

of the specific terms of the Development Agreement, and without requiring an NDA containing

the same protections as the NDA that Poynt had previously signed with Whizz.

28.     Following execution of the Development Agreement, the entire Innowi team

worked full time on Poynt's project.  The team included Hasnain, Rao, and Saeed, as well

Vijaykumar Santhakumar and Chris Woon.

29.     As the Development Project proceeded, Poynt continued to believe that it had

hired Whizz as its design contractor, and Innowi continued both (a) to let that apparently incorrect

belief go uncorrected, and (b) to continue to affirmatively represent and hold themselves out as

being part of Whizz.  For example, when Robert Hernandez introduced the Innowi team to

Poynt's security chip supplier, he referred to them as Whizz, and the Innowi team did not correct

him. *See, e.g.*, **Exhibit G**.  Poynt also escalated concerns about the Innowi team to Ifran at Whizz

as the final step in the escalation process, and no one from Innowi ever suggested that they were a

separate entity and/or that Ifran was not ultimately in charge.  Indeed, Ifran even attended the

final meeting where the parties tried to reconcile before the termination of the Development

Agreement.  And, consistent with its prior representations that Innowi was a part of Whizz,

Innowi continued to use Whizz emails, to sit in Whizz's office and to submit work product

(including, e.g. schematics for Poynt's proposed device) related to the project on documents

stamped with Whizz's logo.

30.     At the time the parties entered into the Development Agreement, Innowi publicly

emphasized that its core team's prior experience related primarily to mobile and wireless

telecommunications products and that it had general experience in consumer electronics, wireless

communication, medical technology, and automotive product development.  *See*

https://web.archive.org/web/20141217125302/http://innowi.com/ (last accessed March 20, 2019).

Innowi's website did not suggest that it had any prior experience with payment terminal products.

31.     As Poynt started working with Innowi, Poynt's team found that the Innowi team

was neither knowledgeable about nor experienced in numerous important payment technologies

such as card readers, EMV chips, and payment processing.  Poynt also found that the Innowi team

lacked expertise with near field communication ("NFC") technology and with the governing

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

industry standards—including the Payment Card Industry Data Security Standard ("PCI DSS"), Payment Card Industry PIN Transaction Security ("PCI PTS") and EMV standard—and lacked knowledge of how to navigate the design constraints those standards imposed.

32.     During the Development Agreement project, Poynt disclosed and Innowi obtained access to Poynt's source code repositories, internal development information repositories and industry expertise.  Indeed, over the course of the Development Project, Innowi had access to an enormous amount of Poynt's confidential technical and business information, including:

- the assembly bill of materials and component data sheets for Poynt's terminals;
- Poynt's product requirement documentation;
- proposed, in-development and final design files including those showing mechanical design (including 3D mechanical designs), schematics, and printed circuit board designs;
- source code and source code design for Poynt's proprietary terminal operating system, including kernel and boot-loader code;
- source code and source code design for firmware, drivers and APIs;
- lists of open issues regarding the development of the Poynt terminal;
- lists and contact information for Poynt's suppliers, vendors and other service providers; and
- the hardware designs, work product, design dead ends and other non-public information that Innowi created while performing its work under the Development Agreement.

33.     It is a well-known and universally accepted principle of the design manufacturer contracting industry that contractors will not use or disclose a client's confidential information and that the client will own *all* of the intellectual property derived from the client's Development Project.  This principle is fundamental to the industry because— without it—clients would not trust contractors with their business plans and technology.  Poynt, Whizz, and Innowi were all well aware of this custom and practice and demonstrated their understanding of its applicability during the Development Project.  For example, the work product that Innowi provided to Poynt

1   frequently included confidentiality markings designating the material "proprietary and

2   confidential."  As another example, Hasnain from Innowi ensured that other parties involved in

3   Poynt's Development Project signed NDAs to protect confidential information associated with

4   the Development Project.  See **Ex. G**.

5   34.   In addition to requiring confidentiality prior to sharing its information, Poynt takes

6   many other measures to protect its confidential technical and business information.  Poynt's

7   building can and at all relevant times could only be entered with a badge, and Poynt's offices

8   within that building cannot and could not be entered without an individually-assigned PIN code.

9   Poynt has and does monitor the site with video cameras.  Poynt's computers are and were

10  protected by a network firewall and cannot and could not be accessed without entering an

11  individually-assigned login.  Poynt's source code and development repositories cannot and could

12  not be accessed without submitting two-factor authentication.  And access to such sensitive data

13  is limited to only engineers and necessary contractors operating under non-disclosure agreements.

14  35.   Poynt's employees are also required to abide by detailed Security & Information

15  Technology Policies and Procedures.  Because Poynt's products handle cardholder information,

16  compliance with these security requirements is necessary to Poynt's Payment Card Industry

17  ("PCI") certification.  Poynt's robust security policies include measures that, for example, require

18  that cabinets and storage rooms remain locked after hours, that computers be configured with a

19  password protected screen saver, that no personal computers access the Poynt wireless network,

20  that sensitive information be encrypted when transmitted over the internet, and several other such

21  policies.  Compliance with these policies is regularly audited, and failure to comply results in

22  discipline, potentially including termination.

23   **B.    Innowi Breaches the Agreements and Misappropriate Poynt's Trade Secrets**

24  36.   During the Development Project, Poynt paid Innowi over $700,000.  After Innowi

25  missed or pushed back multiple deadlines, the prototype Innowi submitted to Poynt was very

26  unstable.  Further, Innowi communicated to Poynt that it would be unable to meet the

27  Development Agreement's cost requirements, instead asserting that the manufacturing cost of the

28  payment terminal hardware would be more than five times as expensive as the parties had agreed.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

37.     As a result of Innowi's failures, in December 2014, Poynt exercised its right to terminate the Development Agreement and transitioned the payment terminal design manufacturing project to another contractor.  To facilitate the separation, Poynt sent Innowi a list of outstanding tasks, and a proposed termination agreement.  This proposed termination agreement contained quit-claim provisions assigning to Poynt all intellectual property related to the Development Project, as required by the Development Agreement.  Poynt also demanded that all Poynt property be returned and that all Poynt confidential information be returned or destroyed.  A copy of the draft termination agreement will be filed under seal as **Exhibit C**.

38.     The process of terminating the relationship between Poynt and Innowi dragged into 2015.  Innowi refused to execute the proposed agreement.  Instead, Innowi sent Poynt a new proposal that included a provision stating, in contradiction to the Development Agreement, that Innowi would own "any know-how" relating to the Development Project.  But Innowi's draft *acknowledged* that "Innowi assumes full responsibility for Whizz's compliance with the [Development Agreement] and its confidentiality obligations to Poynt."  A copy of Innowi's draft agreement will be filed under seal as **Exhibit D**.  Ultimately, no agreement was reached.

39.     Following termination of the Development Agreement, Innowi represented that it was continuing to conduct business as a design manufacturing contractor.  According to the Internet Archive, on August 1, 2015, several months after Poynt had terminated Innowi from the Development Project, Innowi's website echoed Poynt's usual talking points about the need to modernize the payment point-of-sale industry and explained how "dumb terminals" had limited the growth of the point-of-sale industry.  Innowi further stated that it has helped "one of its partners," a reference to Poynt, introduce the world's first payment device.  Innowi's website then offered its services to other interested parties seeking to develop their own payment terminal device.  *See* https://web.archive.org/web/20150801130549/http://innowi.com/ (last accessed 3/13/2019).

40.     Innowi's public website continued to advertise its services as a design manufacturing contractor until as late as February 2016.  However, unbeknownst to Poynt, Innowi had begun transitioning from a general design contractor focused on mobile and wireless

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

device development for third parties to a point-of-sale payment terminal provider intent on directly competing with Poynt.  As the evidence is likely to show after a reasonable opportunity for further investigation or discovery, this transition was facilitated by Innowi's improper use of Poynt's confidential trade secrets that they retained following the termination of the Development Agreement and, over the next four years, they impermissibly used Poynt's confidential information to develop a competing product.

41.     In or around May 2016, Poynt learned from a customer that Innowi told a customer that Innowi was developing its own point-of-service payment terminal product.  Innowi also falsely told the customer that Innowi designed Poynt's payment terminal product.

42.     On or around July 20, 2016, Poynt's outside counsel sent a letter to Hasnain at Innowi.  The letter explained, among other things, that Innowi is under a legal obligation to not use or disclose Poynt's confidential information, particularly to obtain a competitive advantage over Poynt.  The letter further requested that Innowi confirm that it had not used or disclosed Poynt's confidential information for any purpose.  A true and correct copy of this letter is attached hereto as **Exhibit E**.

43.     On or around August 8, 2016, Innowi's outside counsel responded to Poynt's letter and represented that "Innowi is not using or disclosing any of Poynt's confidential information or any materials based on or derived from Poynt's confidential information" and that "Innowi is not using or disclosing any confidential, proprietary, or trade secret information of Poynt developed under the [Development] Agreement."  A true and correct copy of this letter is attached hereto as **Exhibit F**.

44.     Innowi has since announced that it intends to release a competing payment terminal product called the "ChecOut M," and is demoing that product with at least one customer.

45.     Innowi had extensive access to Poynt's trade secret information.  Hasnain, Rao, and Saeed each had access to Poynt's confidential information and participated extensively in the development of Poynt's product under the Development Agreement.  Each of these individuals continues to serve in executive positions at Innowi.  The evidence is likely to show after a reasonable opportunity for further investigation or discovery that Messrs. Hasnain, Rao and Saeed

1    were executives at Innowi at all relevant periods during the company's development of the

2    ChecOut M product and the company's transition from contract manufacturer to point-of-sale

3    payment terminal producer.

4            46.    The evidence is also likely to show after a reasonable opportunity for further

5    investigation or discovery that Innowi improperly used Poynt's confidential information related to

6    the Development Project to advance its own development of a competing product.  Indeed, even a

7    simple comparison of the two companies' development timelines strongly suggests that Innowi

8    has made use of Poynt's confidential information.  Poynt was founded in 2013 by Osama Bedier,

9    a payment technology veteran who led Google Wallet and payments division at PayPal.  Much of

10   Osama Bedier's team at Poynt has similarly specialized experience in engineering, product

11   development and the financial technology industry.  But even with Poynt's specialized team and

12   singular focus, it took them a little over one year to develop a prototype for the Poynt Smart

13   Terminal.

14           47.    By contrast, the Innowi team is significantly smaller and (prior to the Development

15   Project) had no significant experience in the financial technology field generally or with the

16   payments industry specifically.  Nor was Innowi familiar with the exacting industry standards or

17   the techniques required to create a commercially-viable product that could be certified under

18   those standards.  Despite these severe disadvantages, the Innowi team produced a working

19   specimen of its product only, at most, eight months slower than Poynt, and that assumes the

20   Innowi team worked diligently towards their prototype as soon as Poynt terminated the

21   Development Agreement.  The evidence is likely to show after a reasonable opportunity for

22   further investigation or discovery that Innowi could not have developed its product so quickly

23   without misappropriating Poynt's trade secrets or breaching the Development Agreement.

24           48.    Moreover, a comparison of the architecture and components of Innowi's product

25   reveals that Innowi is using the same architecture and component selection as Poynt.  The number

26   of similarities (including the use of numerous identical components in the same or similar

27   architecture) cannot reasonably be attributed to a coincidence.  And, Innowi does not appear to be

28   using the components that, during the Development Project, the parties determined to be

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

1   suboptimal.  Further, Innowi used the knowledge they obtained from Poynt of effective third-
2   party suppliers and vendors to advance their one development timeline.  For example, Poynt has
3   learned that one of its consultants (who aided in the tuning of NFC antennae and who Innowi
4   learned about as a result of its work on the Development Agreement) was later hired by Innowi to
5   assist Innowi in the development of its own payment terminal product.

6       49.    Moreover, as shown below, Innowi used information it obtained from or otherwise
7   belonging to Poynt to file for patents.

8       50.    Innowi's use of Poynt's intellectual property has given Innowi a head start in
9   developing a product that will reach the market alongside Poynt's products and which are
10  designed to compete directly with Poynt's products.  Innowi's unfair head start has been harmful
11  to Poynt including through the loss of market share and opportunities to prove out the viability of
12  its product with large customers.  As a result of Innowi's breaches of its agreements with Poynt
13  and Innowi's misappropriation of Poynt's trade secrets, Poynt is now being forced to compete
14  against a product unfairly developed with the benefit of Poynt's investments in its own trade
15  secrets.

16      **C.     Innowi Files Patents Derived From Poynt's Development Project**

17      51.    Innowi has also attempted to patent technologies based on Poynt's Development
18  Project, despite the fact that the Development Agreement specifically states that Poynt is to own
19  any intellectual property that is derived from the Development Project.

20      52.    To be clear, the Development Agreement provides that Poynt was the exclusive
21  owner of the *right* to claim any ideas associated with and derived as a result of the Development
22  Project as its intellectual property, and that Innowi was not entitled to do so.  Put different, insofar
23  as Innowi's patents are derived from the work that Innowi did for Poynt, Innowi was not
24  permitted to file those patents and Poynt is the rightful owner of such patents under the express
25  terms of the Development Agreement.  Because Innowi's patents are *derived from* the work that
26  Innowi did for Poynt, Poynt is the rightful owner of those patents.

27      53.    Each of Innowi's patents and applications describe a payment terminal device that
28  includes various features.  The claimed payment terminal device is essentially identical to (and

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

1    clearly derived from) the device that Innowi worked on for Poynt during Poynt's Development

2    Project.  As set forth in more detail below, every idea reflected in the claims of the patents can be

3    traced back to information that Poynt provided to the Innowi or that Innowi developed through its

4    work on Poynt's Development Project.  In some of its patent claims, Innowi attempts to add

5    additional features to the underlying payment terminal product that mirrors Poynt's product.  But

6    (1) in many cases, these additional features reflect ideas that Poynt revealed to Innowi during the

7    Development Agreement, and (2) because Innowi's patents are derived from the work that Innowi

8    did for Poynt, Poynt is the rightful owner of those patents regardless of any new features that

9    Innowi may have added.

10          54.    In many cases, and as demonstrated below, documents that Poynt provided to

11   Innowi or that Innowi developed as part of the Development Project demonstrate that the claimed

12   ideas are derived from the Development Project.

13          55.    Moreover, as set forth in more detail below, several of the features claimed in

14   Innowi's patents were showcased in a product demonstration of the Poynt payment terminal

15   prototype, that Innowi helped develop during the Development Project, at the Money20/20

16   conference in November of 2014 while the Development Project was in progress.  Saeed,

17   Hasnain, and Rao observed Osama Bedier and Ray Tanaka preparing for that conference and

18   were in the audience for Poynt's demonstration.  Innowi knew that the Poynt device they had

19   helped build could function in the ways demonstrated at the Money20/20 conference.  A video of

20   that presentation is available online.  *See* https://www.youtube.com/watch?v=_eZX-JCZiRE (last

21   accessed 3/13/2019).

22          56.    Poynt's own patent application (which also resulted from the Development Project

23   and was filed in October 2014) also shows that Innowi's patents are derivative.  As Poynt's

24   contract developers, Innowi assisted with the preparation of Poynt's patent application and were

25   well aware of its contents.  As shown below, however, Innowi's patents claim much of the same

26   subject matter disclosed and claimed by Poynt's patent.  An overlap that shows that Innowi was

27   using ideas and concepts coming out of the Development Agreement to file its patent

28   applications.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

57.     The timing of Innowi's initial patent application is also evidence of derivation.  On September 9, 2015, only nine months after Poynt terminated its project with Innowi, Saeed, Hasnain, and Rao, each of whom had access to Poynt's confidential information and participated extensively in the development of Poynt's product under the Development Agreement, filed U.S. Patent Application No. 14/850,943, titled "Smart Integrated Point of Sale System."  This application issued as U.S. Patent No. 10,127,538 (the "'538 patent") on November 13, 2018, and is assigned to Innowi.

58.     The '538 patent describes and claims an alleged invention that was derived from Innowi's work on Poynt's Development Project.  The ideas claimed in '538 patent are derived from Innowi's work on Poynt's Development Project.  First, the payment terminal device claimed in the patent is essentially identical to the product that Innowi helped develop during the Development Project.  Second, the '538 patent's patent application was filed only nine months after Poynt terminated Innowi's role on the Development Project.  Third, the members of the Innowi team appeared to lack any specialized knowledge about payment technologies and payment terminals prior to their work on Poynt's Development Project.  They therefore would not have had the technical knowledge needed to independently conceive of these payment terminal related concepts but for their participation in Poynt's Development Project.  Fourth, to the extent the '538 patent describes a device that differs from Poynt's product or includes an idea that was not expressly discussed with Innowi during the Development Project, such differences and ideas relate to features that are well-known computer and retail technologies, described at a high level of generality, which are merely tacked on to the underlying core product (Poynt's product).  Thus, the addition of these features does not change the fact that the overall application and claims are derived from Poynt's Development Project.

59.     For example, the following discussion aligns independent claim 1 of the '538 patent with confidential documents and other information that Poynt provided to Innowi or which Innowi developed under the Development Agreement:

1. An integrated point of sale (PoS) device comprising;

[1a] a tablet processor;

[1b] a secure processor;

[1c] a memory for storing executable instructions that comprise a business management system;

[1d] a housing comprising the tablet processor, secure processor, memory, and a plurality of video display screens;

[1e] wherein at least one merchant display screen is coupled to at least one customer display screen;

[1f] a business management system receiving input from the plurality of video display screens;

[1g] at least one payment reader coupled to at least one of the processors, wherein the at least one payment reader is capable of accepting at least magnetic swipe cards, EMV (Europay, MasterCard, and Visa) chip and pin cards, and NFC (near field communication) payment;

[1h] a barcode scanner coupled to at least one of the processors;

[1i] a cash drawer coupled to at least one of the processors;

[1j] a printer coupled to at least one of the processors;

[1k] an ADA (American Disabilities Act) compliant secure keypad coupled to at least one of the processors; and

[1l] a biometric verification unit coupled to at least one of the processors, and

[1m] wherein a camera is located on the side of the housing containing the at least one customer display screen to securely identifying a customer by face recognition, [1n] and wherein the face recognition of the customer applies the customer's loyalty program accounts, accumulated reward points, and coupons.

Independent claim 22 recites substantially the same limitations.

60.     Each of these claim limitations describes a payment terminal device and is derived from Innowi's work on Poynt's Development Project.  Turning to the limitations of claim 1 of the '538 patent, Poynt provided Innowi with documents describing an integrated point-of-sale device comprising "a tablet processor" [1a] and "a secure processor" [1b] during the Development Agreement.  For example, the Product Requirements Document provided on June 14, 2014 ("PRD"), and produced in this case as POYNT0000274-306, describes a device with a tablet processor (*see* POYNT0000285 and POYNT0000288 (pages 12 and 15)) and a secure processor (POYNT0000293 (page 20)).

61.     Poynt also provided Innowi with documents indicating that the developed payment terminal product would include "a memory for storing executable instructions that comprise a business management system" [1c].  For example, the PRD explains that the device is to provide "unrestricted Application features and function through the Tablet interface."  (*see* POYNT0000281 (pages 8).  Further, Innowi knew that Poynt's product included an app called "Insights" (previously referred to as Co-Pilot), which served as a business management and analytics tool to help merchants manage their businesses.  During its work on Poynt's payment terminal, Innowi was also informed and aware that Poynt's payment terminal device was compatible with other business management software developed by third parties on Poynt's open source platform, including, for example, business management software developed by Vend for use on the Poynt platform.  The Vend application working on Poynt's platform was demonstrated at the 2014 Money20/20 conference.

62.     During the Development Project, Poynt also provided Innowi with documents describing a payment terminal that included a "housing comprising the tablet processor, secure processor, memory, and a plurality of video display screens, wherein at least one merchant display screen is coupled to at least one customer display screen." [1d] and [1e].  For example, in the document produced as POYNT0000082-86 (K2 Smart POS Terminal), a payment terminal product with a housing is shown, and the payment terminal product contains both a merchant-facing display screen and a customer-facing display screen [1e].  The secure processor is also shown.  As another example, in the document produced as POYNT0000087-89 (K2 Dual Display discussion points), and provided by Innowi's Rao in July 2014, the architecture diagram for the device indicates two LCD screens and both the secure and tablet processor [1d].

63.     Innowi's work on Poynt's Development Project also included "a business management system receiving input from the plurality of video display screens" [1f].  For example, the architecture diagram in POYNT0000087-89 (K2 Dual Display discussion points) indicates that both the tablet side of the device and the payment side of the device include touch screens for input.  These same touch screens are indicated in the document produced as POYNT0000063-77 (K2 Design Innowi updates) at POYNT0000072 (slide 10), which is dated

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

May 30, 2014.  As Innowi knew from its work on Poynt's Development Project, including by assisting with the development of the prototype used in the Money20/20 demonstration, these touch screens could be used to interact with software running on the device, including any business management systems, such as the Poynt Insights app and the previously-mentioned management software developed by Vend.

64.     Poynt's Development Project also involved a payment terminal device with "at least one payment reader coupled to at least one of the processors, wherein the at least one payment reader is capable of accepting at least magnetic swipe cards, EMV (Europay, MasterCard, and Visa) chip and pin cards, and NFC (near field communication) payment" [1g]. Innowi knew that Poynt's device included a secure processor that was capable of accepting each of magnetic swipe cards, EMV chip and pin cards, and NFC payments.  For example, the PRD provided to Innowi indicates that the payment terminal would have a magnetic stripe reader, smart card reader and contactless payment reader using NFC.  *See* PRD (POYNT0000274-306) at POYNT0000288 (page 15).  Furthermore, in both POYNT0000087-89 (K2 Dual Display discussion points) and POYNT0000063-77 (K2 Design Innowi updates) at POYNT0000072 (slide 10), the architectural diagrams depict the magnetic swipe card reader (MSR), EMV chip and pin card reader (smart card) and NFC antenna for accepting NFC payments.  As shown in these documents, each of these card readers is coupled to one of the processors. POYNT0000063-77 (K2 Design Innowi updates) at POYNT0000072 (slide 10).

65.     Innowi was also aware that Poynt's product included a barcode scanner coupled to at least one of the processors.  [1h].  For example, in an informational video about Poynt's product displayed when Osama Bedier discussed that product in November 2014 at the Money20/20 conference, the camera barcode scanner on Poynt's device is indicated:

1

2

3

4

5

6

7

8

9

10



*See* https://www.youtube.com/watch?v=_eZX-JCZiRE (last accessed 3/13/2019).  At the

same conference, Osama Bedier demonstrated how the Development Project prototype that

Innowi worked to develop could scan barcodes utilizing the merchant-facing camera on the

device.



*Id*.  Innowi was also aware that peripheral barcode scanners could be coupled to the processor in

Poynt's device using ports on the device.  *See* https://poynt.com/peripherals/ (last accessed

3/13/2019) (listing barcode scanner peripherals).

66.    Innowi was also made aware during the Development Project that the Poynt

payment terminal device could also include a cash drawer coupled to at least one of the

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

1   processors. [1i].  Specifically, a cash drawer peripheral can be connected to the Poynt device with

2   a USB connection.



19  *See also* https://poynt.com/peripherals/ (last accessed 3/13/2019) (listing cash drawer peripherals)

20          67.     The Development Project product that Innowi worked on for Poynt also included

21  "a printer coupled to at least one of the processors."  [1j]  For example, the PRD

22  (POYNT0000274-306), explains that the device is to have a thermal printer on page 12

23  (POYNT0000285).  The document K2 Smart POS Terminal (POYNT0000082-86), generated by

24  Innowi during development of the Poynt device, also clearly shows the printer of the Poynt

25  payment terminal device on its second page (POYNT0000083).

26          68.     During Innowi's work on Poynt's Development Project, Innowi was also made

27  aware of the potential need for an ADA compliant secure keypad.  [1k]  In particular, the

28  members of the Innowi team and Poynt discussed the possibility of utilizing ADA compliant

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

secure key pads in a payment terminal device.  As a result, the Poynt device that Innowi worked

on developing *for* Poynt includes a USB port that allows peripheral ADA compliant secure

keypads and other peripherals to be utilized with the device.  *See* PRD at POYNT0000290 (page

17) (discussing the USB port).  The idea of the underlying Development Project device, but with

an ADA compliant secure keypad, is derived from the Development Project.

69.     During the Development Project, Poynt discussed with Innowi the desirability of

"a biometric verification unit coupled to at least one of the processors" in a payment terminal

device.  [1l].  This limitation is also recited in dependent claims 14 and 32, which recite an

apparently speculative biometric verification unit that "recognizes fingerprints, retinas, faces,

gestures, ***and*** voices."  (emphasis added).  In Poynt's own patent application, filed in October

2014, Poynt explained how biometric measurement could be used for verification in a payment

terminal device.  Innowi assisted with the preparation of Poynt's patent application and was

aware of the use of biometric verification units for payment terminals through its work on Poynt's

Development Project.  The idea of taking the underlying Development Project product and adding

a biometric verification unit with additional functionalities is derived from Poynt's Development

Project.

70.     Poynt's Development Project also involved a payment terminal device "wherein a

camera is located on the side of the housing containing the at least one customer display screen to

securely identify a customer by face recognition, and wherein the face recognition of the

customer applies the customer's loyalty program accounts, accumulated reward points, and

coupons."  [1m].  The device that Innowi worked on for Poynt utilized cameras located on the

side of the housing.  For example, in both POYNT0000087-89 (K2 Dual Display discussion

points) and POYNT0000063-77 (K2 Design Innowi updates) at POYNT0000072 (slide 10), the

architectural diagrams depict front and rear cameras on the device.  Because Poynt's platform is

open source and supports third party applications, Innowi knew from its work on Poynt's

payment terminal product that software-based facial recognition functionality could be achieved

on Poynt's device with the use of the cameras.  Further, Innowi was also aware that Poynt's

device could offer loyalty program reward points and coupon functionality through its ability to

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

1   host third party business management applications, like the Vend application demonstrated at the

2   2014 Money20/20 conference.

3        71.     The dependent claims of the '538 patent likewise describe concepts that come

4   straight from Poynt's Development Project.  Claims 2, 3, 22 and 23 describe features of business

5   analytics and customer loyalty software like those that were demonstrated using the Development

6   Project prototype that Innowi helped build, including by third parties like Vend.  This capability

7   of the Development Project prototype was demonstrated at the Money20/20 conference in

8   November 2014.

9        72.     Further, claims 4 and 24 of the '538 patent recite using the merchant screen to

10  execute a transaction while the customer screen is used to view the transaction, just as Poynt's

11  product works.  Innowi was aware of this functionality as a result of its work on Poynt's

12  Development Project, as reflected in POYNT0000240 (Payment Fulfillment Flows) document

13  shared with Innowi during the Development Project.  It was also demonstrated at the 2014

14  Money20/20 conference:



26       *See* https://www.youtube.com/watch?v=_eZX-JCZiRE (last accessed 3/13/2019).

27       73.     Claims 5 and 25 of the '538 patent recite allowing a merchant to use the merchant-

28  facing camera of the payment terminal device to communicate with technical support, and further

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

requires that at least one camera can read barcodes.  As Innowi knew, the claimed technical support communication functionality was a functionality of the payment terminal device they helped develop with Poynt, and it was demonstrated at the Money20/20 conference in November 2014 by Osama Bedier through the use of the third-party Boomtown app running on the Development Project prototype that Innowi helped build.  And further, as explained above, Poynt's device has cameras that read barcodes.

74.     Claims 6 and 26 of the '538 patent describe a device where the merchant facing camera can be used to securely log in merchants using facial recognition.  Claims 27 and 28 likewise relate to using the cameras on the device for facial recognition.  Innowi was aware that the placement of Poynt's merchant facing camera was specifically chosen to capture the merchant's face, enabling these uses.

75.     Claim 7 of the '538 patent require that the device include a detachable barcode scanner.  As mentioned above, the Poynt device that Innowi worked on includes a USB port that can accept peripherals like separate barcode scanners.  *See* https://poynt.com/peripherals/ (last accessed 3/13/2019) (listing barcode scanner peripherals).

76.     Claim 8 of the '538 patent requires that the printer and cash drawer be incorporated into a base that supports the housing of the payment terminal device.  Poynt's device includes a printer that forms a base of the payment terminal device.  Poynt's device is also compatible with cash drawers that can form a base for the device.  Innowi's idea of merely incorporating a non-peripheral cash drawer into the base of the device that otherwise is essentially identical to Poynt's device was derived as a result of Innowi's work on Poynt's Development Project.

77.     Claims 9, 10, and 11 of the '538 patent relate to the use of a so-called "smart cash drawer" including certain high-tech features.  This concept is one that Poynt CTO Ray Tanaka discussed with the members of Innowi's team as an aspirational project during the development of Poynt's payment terminal product.  Innowi's officers stole the idea and incorporated it into the '538 patent.

78.    Claim 16 describes the use of a scale.  The Development Project product included the ability to incorporate scales as a peripheral.



79.    Claims 17 and 33 of the '538 patent discuss removing the payment module from the rest of the payment terminal device.  This functionality is a mere extension of Poynt's original idea to treat the payment side of the device as a module, as reflected in the PRD provided to Innowi (POYNT0000274-306).  This idea is thus derived from Innowi's work on Poynt's Development Project.

80.    Claims 18 and 34 requires that the payment module include "an electronic signature screen, at least one payment reader, wherein the payment reader is capable of accepting at least magnetic swipe cards, EMV (Europay, MasterCard, and Visa) chip and pin cards, and NFC (near field communication) payment, and the ADA compliant secure keypad."  These ideas have each been addressed above and, as explained above, were disclosed to Innowi through its work on Poynt's Development Project.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

81.      Claims 19, 20, 35 and 36 recite that the payment terminal device has GPS functionality and can connect to other devices using Wi-Fi, Bluetooth, or cellular networks.  The Poynt product that Innowi worked on during the Development Project included such capabilities, including Bluetooth, Wi-Fi, cellular data, and GPS.  *See* PRD (POYNT0000274-306) at POYNT0000285 (page 12), POYNT0000063-77 (K2 Design Innowi updates) at POYNT0000072 (slide 10).

82.      Claims 12, 13, 29, and 30 each claim the use of a stylus, a common and well-known tool that is often used in conjunction with older payment terminals.  Claims 15 and 16 also recite use a "bi-optic scanner," a commonplace barcode scanning device.  Innowi's idea to tack these well-known payment technologies onto a payment terminal that is otherwise essentially identical to the one they helped develop for Poynt is derived from Poynt's Development Project.

83.      In addition to the aspects of Poynt's product that Innowi claimed in the '538 patent, the specification of the '538 patent discloses other information (including Poynt's trade secret information) that further proves that the alleged inventions described in the '538 patent are derived from Poynt's Development Project.

84.      For example, the Background section of the '538 patent echoes the talking points that Poynt has used to explain the need for a smart payment terminal product.  The same is true of the discussion in column 3, lines 12-22.

85.      At column 6, lines 4-46, the '538 patent discusses treatment of the payment side of the payment terminal device as a module and discusses the benefits of separating the payment side of the device in this manner.  The passage further discusses the use of USB to connect the payment processor to rest of the device.  Both of these ideas were discussed by Poynt and delivered to Innowi in the PRD (POYNT0000274-306), including on POYNT0000287, POYNT0000289 and POYNT0000301 (pages 14, 16, and 28).  Further, aspects of these concepts are claimed as trade secrets and appear on Poynt's trade secret list provided to Innowi in discovery.

86.      At column 6, line 54 to column 7, line 3, the '538 patent explains how the payment terminal device can run an operating system and host third party developed retail applications.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

As Osama Bedier explained at the Money20/20 conference in 2014, the Poynt payment terminal product that Innowi worked on also provides a software operating system platform that can host third party apps, including the apps developed by third parties mentioned during the 2014 Money20/20 conference such as Vend, BigCommerce, Intuit, Kabbage, Swarm and others.

87.     At column 8, lines 16-24, the '538 patent discusses a register app for the payment terminal device that offers identical functionality to the register app on Poynt's payment terminal device, which was demonstrated at the Money20/20 conference in November 2014 and with which Innowi became familiar during its work on the Development Project.

88.     In 2017, Saeed, Hasnain and Rao filed U.S. Patent Application No. 15/618,122, which issued as U.S. Patent No. 10,140,609 (the "'609 patent") on November 27, 2018.  The '609 patent is assigned to Innowi.  The '609 patent is a continuation-in-part of the '583 patent which, as explained above, claims material derived from Innowi's work on Poynt's Development project. As a continuation-in-part, the '609 patent is based in part upon the same material from the '583 patent that was derived from Poynt's Development Project.  And, like the '583 patent, the '609 patent claims material that is derived from Innowi's work on Poynt's Development Project.

89.     Claim 1 of the '609 patent reads:

1. An integrated point of sale (POS) mobile device comprising:

[1a] a mobile-device processor;

[1b] a secure payment processor;

[1c] a memory, coupled to the mobile device-processor and the secure payment processor, for storing executable instructions that comprise a mobile-device payment system and a set of payment data;

[1d] a glass film film (GFF) touch sensor, wherein the GFF touch sensor can be driven by a secure-touch integrated circuit (IC) that encrypts any touch data going to the secure payment processor;

[1e] a cover glass over the GGF touch sensor;

[1f] a display;

[1g] under the cover glass and around the display, an NFC Antenna loop;

[1h] an EMV (Europay, MasterCard, and Visa) card reader system;

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

[1i] an NFC (Near field communication) reader system;

[1j] a Magnetic stripe reader (MSR);

[1k] housing comprising the mobile-device processor, the secure payment processor, the memory, the EMV (Europay, MasterCard, and Visa) card reader system, the NFC (Near field communication) reader system, the Magnetic stripe reader (MSR);

[1l] an MSR card slot;

[1m] an EMV card slot;

[1n] a mobile-device payment system receiving input from the EMV card reader system, the MSR system, and the NFC reader system;

[1o] a security mesh securing the secure payment processor and the EMV card reader such that the security mesh must be removed to access the EMV card reader or the secure payment processor, [1p] wherein the security mesh causes the memory to delete the payment data when a current passing through the security mesh is interrupted, and wherein any data related to the EMV card reader system, the NFC reader system, and the MSR system is deleted from the memory and the security payment processor when the current passing through the security mesh is interrupted.

90.     The Poynt device that Innowi worked on as part of the Development Project included each of these features claimed in the '609 patent.  As explained above with regard to the '538 patent, the Development Project product included a mobile device processor, a secure payment processor, a memory that was coupled to the mobile device-processor and the secure payment processor, for storing executable instructions that comprise a mobile-device payment system and a set of payment data, a display, an EMV card reader, an NFC card reader and magnetic stripe card read, an MSR card slot, an EMV card slot, and a payment system that receives input from the payment reader systems.  [1a], [1b], [1c], [1f], [1h], [1i], [1j], [1k], [1l], [1m], [1n].  These features are demonstrated in POYNT0000087-89 (K2 Dual Display discussion points) and POYNT0000063-77 (K2 Design Innowi updates) at POYNT0000072 (slide 10), as well as several other design documents from the period of the Development Project.

91.     Innowi also knew that the Development Project product utilizes a GFF touch sensor driven by a secure touch integrated circuit that encrypts touch data, includes a glass cover over the touch sensor, and uses an NFC loop antenna that loops around the display and is under the glass cover.  [1d], [1e], [1g].  The touchscreen and NFC loop antenna can be seen in

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

1    POYNT0000082-86 (K2 Smart POS Terminal) and other design documents from the period of

2    the Development Project.

3           92.    Innowi was also aware from the Development Project that Poynt's payment

4    terminal product included "a security mesh securing the secure payment processor and the EMV

5    card reader such that the security mesh must be removed to access the EMV card reader or the

6    secure payment processor, wherein the security mesh causes the memory to delete the payment

7    data when a current passing through the security mesh is interrupted, and wherein any data related

8    to the EMV card reader system, the NFC reader system, and the MSR system is deleted from the

9    memory and the security payment processor when the current passing through the security mesh

10   is interrupted." [1o], [1p].  The security mesh for Poynt's product is depicted in

11   POYNT0000082-86 (K2 Smart POS Terminal) and other design documents from the period of

12   the Development Project, and functions as Innowi described in its patent claim.

13          93.    The dependent claims of the '609 patent are also reflected in the work for Poynt's

14   Development Project.  Claim 2 adds a barcode scanner.  Claim 3 adds a biometric verification

15   unit.  As explained above in paragraphs 65 and 69, these concepts reflect ideas that were derived

16   from the Development Project.

17          94.    Claim 4 adds that the payment board has a secure payment processor.  The

18   Development Project product also had a secure payment board with a secure payment processor.

19   For example, POYNT0000087-89 (K2 Dual Display discussion points) and POYNT0000063-77

20   (K2 Design Innowi updates) at POYNT0000072 (slide 10) display the payment board that hosts

21   the secure processor, separate from the application board.

22          95.    Claims 5 and 6 of the '609 patent relate to the way that the mobile and payment

23   circuit boards are connected to one another.  As in claim 6, the Development Project product uses

24   a USB connection.  The pogo-pin connection discussed in claim 5 is an insignificant deviation

25   using a known type of connection added on to a product that is otherwise identical to the one that

26   Innowi worked on for Poynt.  Indeed, Innowi's work on Poynt's Development Project involved

27   the use of pogo-pins as part of Poynt's charging dock for the Development Project product.  The

28

1    idea of a version of Poynt's Development Project product with a pogo-pin connection between

2    the two circuit boards derived from Poynt's Development Project.

3         96.    The '609 patent is therefore also derived from Innowi's work on Poynt's

4    Development Project.  Like the '538 patent, the product claimed in the '609 patent is essentially

5    identical to the product that Innowi helped develop during the Development Project, and any

6    minor differences are merely tacked on to the underlying Development Project product.

7         97.    On October 1, 2017, Saeed, Hasnain, Rao, and others filed a U.S. Patent

8    Application No. 15/721,923 (the '923 application).  The patent application has not yet issued but

9    has received a notice of allowance.  The '923 application is assigned to Innowi.  The '923

10   application is a continuation-in-part of the '583 patent which, as explained above, claims material

11   derived from Innowi's work on Poynt's Development project.  As a continuation-in-part, the '923

12   patent is based in part upon the same material from the '583 patent that was derived from Poynt's

13   Development Project.  And, like the '583 patent, the currently allowed claims of the '923

14   application claim material that is derived from Innowi's work on Poynt's Development Project.

15        98.    Specifically, currently allowed claim 1 of the '923 applications recites a payment

16   terminal that, like the Development Project terminal, includes both a payment module and a

17   mobile device module, and includes a mobile-device processor, a secure payment processor, a

18   memory, an EMV (Europay, Mastercard and Visa) card reader system, a Magnetic Stripe reader

19   (MSR).  Other allowed claims discuss including a GFF touch controller.  Each of these

20   components and features were disclosed to Innowi in documents or were included in the

21   Development Project device, as explained above.

22        99.    The other allowed claims of the '923 application recite various details about the

23   housing of the device or the NFC antennae of the device.  However, a device that is Poynt's

24   Development Project device with a modified housing or antenna is still derived from Poynt's

25   Development Project device.

26        100.   On October 1, 2017, Saeed Hasnain and Rao filed a U.S. Patent Application No.

27   16/178,558 (the '558 application).  The '558 patent application it not publicly available, but is

28   designated on the U.S Patent and Trademark Office Public Patent Application Information

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

Retrieval (Public PAIR) website as a "child" of the '583 patent.  The '583 patent, as explained above, claims material derived from Innowi's work on Poynt's Development project.  As a child of the '583 patent, the '558 application is based, at least in part, upon the same material from the '583 patent that was derived from Poynt's Development Project.  The '558 application is therefore also derived from Innowi's work on Poynt's Development Project.

101.    Innowi never informed Poynt that it was seeking these patent applications, despite the fact that the Development Agreement expressly states that all intellectual property associated with and derived as a result of the Development Project is to be owned by Poynt.

102.    Further, illustrating Innowi's bad faith, Innowi did not disclose to the U.S. Patent Office any information about Poynt's own utility patents, Osama Bedier's patents, or Poynt's product, despite its legal duty to disclose all prior art of which it was aware.  Innowi assisted with the preparation of a Poynt utility patent and knew or should have known that it was relevant prior art, but nonetheless neglected to disclose it to the patent office.

**First Cause of Action – Breach of the Non-Disclosure Agreement**

103.    Poynt realleges and incorporates by reference Paragraphs 1 through 102, inclusive, of this First Amended Complaint, as though fully set forth herein.

104.    In March 2014, Poynt executed a Mutual Non-Disclosure Agreement ("NDA"), a copy of which is attached as **Exhibit A**.  The NDA was signed by Ifran of Whizz.  The NDA was willingly agreed to by both parties without duress or undue influence and is valid and enforceable.

105.    Pursuant to the NDA, each party's confidential business and technical information was to be maintained in strict confidence for a period of at least five years, and not used for any purpose except for the mutual business opportunity.  **Ex. A ¶ 2**.

106.    The NDA provides that "Upon the disclosing party's request, the receiving party will promptly return to the disclosing party all tangible items and embodiments containing or consisting of the disclosing party's Confidential Information and all copies thereof (including electronic copies) and provide the disclosing party with a written officer's certificate certifying the receiving party's compliance with the foregoing obligation." **Ex. A ¶ 4**.

FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

107.    The NDA further provides that "Each party acknowledges that the unauthorized use or disclosure of the disclosing party's Confidential Information would cause the disclosing party to incur irreparable harm and significant damages, the degree of which may be difficult to ascertain.  Accordingly, each party agrees that the disclosing party will have the right to obtain immediate equitable relief to enjoin any unauthorized use or disclosure of its Confidential Information, in addition to any other rights and remedies that it may have at law or otherwise." **Ex. A ¶ 7**.

108.    The NDA remains in effect and shall not terminate until five years after the date of the last disclosure of confidential information by either party.  **Ex. A ¶ 9**.

109.    Although the NDA is signed by Ifran, Innowi is bound by the NDA.  Innowi is bound to the NDA through at least four different legal theories.

110.    First, Innowi is equitably estopped from asserting that it is not a party to the NDA. Equitable estoppel prohibits a party from portraying the facts in one way (through representations or conduct), and then asserting a fact inconsistent with those representations in litigation.  In addition to the misleading representation/conduct, equitable estoppel has four elements: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 489, 476 P.2d 423, 442 (1970).

111.    Innowi's representations and conduct in portraying itself as part of Whizz estop Innowi from asserting that it is not bound by the NDA.  In or around March 2014, Innowi, through its conduct in negotiating the NDA and dealing with Poynt, represented to Poynt that the members of the Innowi team were part of Whizz, including by, for example, attending NDA-protected negotiations at Whizz's offices and allowing Ifran, Whizz's president, to refer to the Innowi team as part of Whizz.  Additional allegations regarding Innowi's misleading conduct are recited in at least Paragraphs 13, 14, 23 and 29, above.

112.    Under the first element of equitable estoppel, Innowi was apprised of the facts that were inconsistent with its representations.  When Innowi's engaged in the above-discussed representation and conduct, Innowi knew that it was a separate legal entity from Whizz.

113.    Under the second element of equitable estoppel, Innowi intend that its conduct and representations would be acted upon, and acted such that Poynt had a right to believe that Innowi so intended.  Innowi intended, and Poynt had a right to believe that Innowi intended, for Poynt to rely upon its representations that it was part of Whizz because Innowi knew that Poynt had required Whizz sign an NDA before receiving confidential information, and Innowi nonetheless attended the meeting with Poynt with the intent to receive and discuss the same confidential information that Poynt had sought to protect with its NDA with Whizz.  Innowi's intent (and Poynt's right to believe that intent) is also shown by, among other things (a) the fact that Innowi continued to maintain the deception both through the signing of the Development Agreement and the long duration of the parties' relationship without ever clarifying that it was a separate entity; (b) the fact that Innowi got an advantage in obtaining Poynt's business by portraying itself as part of Whizz (which is the party to whom Poynt had been referred / for which Poynt had received a recommendation) and therefore had a financial motive for portraying itself as part of Whizz and (c) the fact that Innowi tried to trade an agreement that it would adopt Whizz's obligations for further consideration at the end of the parties' relationship (which indicates that Innowi saw its non-disclosure of its corporate identity as a source of additional value).  Additional allegations regarding Innowi's intent is recited in at least Paragraph 17, above.

114.    Under the third element of equitable estoppel, Poynt was ignorant of the true state of facts regarding Innowi's apparently separate legal status.  Poynt was unaware that the "Whizz design team" it sought to hire was not part of Whizz but was in fact a separate entity that had not signed the NDA.  Additional allegations regarding Poynt's lack of knowledge relating to Innowi are recited in at least Paragraphs 15, 23 and 25, above.

115.    Under the fourth element of equitable estoppel, Poynt reasonably relied on Innowi's conduct to its injury.  Because Poynt believed Innowi's representation that it was part of Whizz and therefore covered by the NDA, Poynt disclosed confidential information to Innowi

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

and did not require that Innowi sign a similar NDA.  Poynt has been injured by this reliance as Innowi now asserts it is not bound by the NDA and has breached the terms of the NDA. Additional allegations regarding Poynt's reliance and injury are recited in at least Paragraphs 18, 19 and 21, above.

116.    Innowi is therefore equitably estopped from asserting that it is not bound by the NDA and that only Whizz is bound by the NDA.

117.    Second, Innowi is bound by the NDA because the then-undisclosed Innowi authorized Ifran, either expressly or implicitly, to sign the NDA as Innowi's agent.

118.    Under California law, an agent is defined as "one who represents another, called the principal, in dealings with third persons." Cal. Civ. Code § 2295.  "Whether a person performing work for another is an agent ... depends primarily upon whether the one for whom the work is done has the legal right to control the activities of the alleged agent." *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1579, (1994), as modified (Nov. 14, 1994), as modified on denial of reh'g (Nov. 17, 1994), as modified (Nov. 22, 1994).  Agency may be implied from the circumstances and conduct of the parties. *Id*.  An undisclosed principal is liable for contracts signed by their agents on their behalf. *Imperial Val. Box Co. v. Reese*, 105 Cal. App. 2d 401, 403 (1951).

119.    At the time the NDA was signed, Ifran of Whizz was acting as Innowi's agent and Innowi had a legal right to control Ifran's conduct with regard to signing the NDA.  Ifran signed the NDA knowing that doing so was a necessary condition to progressing Innowi's negotiations with Poynt, and thus acted on behalf of Innowi.  As the evidence is likely to show after further opportunity for investigation and discovery, Innowi expressly authorized Ifran to sign the NDA. At minimum, Ifran was implicitly authorized to sign the NDA in his role as the facilitator of negotiations between Poynt and Innowi.  Additional allegations regarding Whizz and Ifran's agency are recited in at least Paragraph 20, above.

120.    In signing the NDA, Ifran was acting as an agent of Innowi, and Innowi was the undisclosed principal and real party in interest.  Innowi is therefore bound by Whizz's execution of the NDA.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

121.    Third, regardless of whether Ifran had authority to bind Innowi when it executed the NDA, Innowi subsequently ratified Ifran's execution of the NDA on its behalf and is therefore bound by the NDA.

122.    Ratification involves three elements:  (1) an agent must purport to act on a principal's behalf, (2) the principal must adopt or approve of the agent's act, either expressly or through conduct from which adoption may be inferred (such as retaining the benefits of the act), and (3) the principal must know all material facts at the time of the adoption or approval of the agents act. *Rakestraw v. Rodrigues*, 8 Cal. 3d 67, 73 (1972).

123.    Under the first element of ratification, Ifran was acting as an agent of Innowi, as explained above.  Ifran purported to act on behalf of the intended design team (*i.e.* the Innowi team) in signing the NDA that was required for their participation in negotiations and hiring. Ifran's agency is also shown by the fact that he hosted the initial meeting and introduced the Innowi team.  Additional allegations regarding Ifran's agency are recited in at least Paragraphs 20 and 119, above.

124.    Under the second element of ratification, Innowi subsequently ratified Ifran/Whizz's execution of the NDA on its behalf through its acceptance of the benefits of the NDA, including by receiving Poynt's confidential information under the NDA, proceeding to negotiate with Poynt, eventually being hired by Poynt as a contract developer and affirmatively invoking the terms of the NDA to protect what was purportedly Innowi's own confidential information.  Additional allegations regarding Innowi's acceptance of the benefits of the NDA are recited in at least Paragraphs 12, 13, 23, 34 and 32, above.

125.    Under the third element of ratification, Innowi knew that Ifran/Whizz had signed the NDA, was familiar with the terms of the NDA, and had knowledge of all material facts pertaining thereto when it acted to adopt/accept the benefits of the NDA.

126.    Through its subsequent ratification Ifran's execution of the NDA, Innowi is bound by the NDA.

127.    Fourth, Innowi is bound by the NDA because Ifran signed the NDA as an ostensible agent acting with the apparent authority of Hasnain, an officer of Innowi.

128.    For a principal to be bound by the acts of an ostensible agent, three requirements must be met: (1) "the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one;" (2) "such belief must be generated by some act or neglect of the principal sought to be charged;" and" (3) the third person in relying on the agent's apparent authority must not be guilty of negligence." *See Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 747 (1997).

129.    Under the first element of ostensible agency, Poynt dealt with Ifran in executing the NDA with the reasonable belief that Ifran had the authority to bind the "Whizz design team" (a.k.a. Hasnain's design team, a.k.a. Innowi) to the terms of the NDA.  Additional allegations regarding Poynt's belief in Ifran's authority are recited in Paragraphs 16 and 21, above.

130.    Under the second element of ostensible agency, Poynt's belief that Ifran had authority to bind the design team to the terms of the NDA was generated by the acts and neglect of ***Hasnain*** and his design team, including (a) allowing Ifran to sign the NDA that was intended to bind the team that would negotiating to work on Poynt's Development Project without ever suggesting that another NDA was needed (b) allowing  Ifran to hold Innowi out as being part of Whizz without challenging or correcting him; (c) negotiating the Development Agreement as one ostensibly between Poynt and Whizz (while inserting Innowi as a signatory at the last moment by writing in its name) and (d) by working in Whizz's office, using Whizz's emails for their work correspondence and labeling their work product as having been produced by Whizz without clarifying that Innowi was a separate legal entity over which Whizz lacked authority.  Additional allegations regarding the Hasnain's representations are recited in at least Paragraphs 14, 15 16 and 21, above.

131.    Under the third element of ostensible agency, Poynt was not guilty of negligence but instead reasonably relied on Ifran's apparent authority to bind Hasnain's team to the terms of the NDA.  As noted previously, Poynt had no reason to know that Ifran – the CEO of Whizz – didn't have authority to bind people he held out as the "Whizz design team," who sat in his office, used his email system and labeled their documents as having been produced by Whizz.  To the contrary Poynt took reasonable measures to protect itself including by requiring a signed NDA

1   before the first meeting.  Additional allegations regarding Poynt's lack of negligence and reliance

2   are recited in at least Paragraphs 15, 16, 18 and 21, above.

3          132.    Innowi is therefore bound to the terms of the NDA through Whizz's ostensible

4   agency.

5          133.    Because Innowi is bound by the NDA, Innowi can be held liable for breach of the

6   NDA.

7          134.    Poynt performed its obligations under the NDA, including but not limited to

8   maintaining Innowi's confidential information.

9          135.    During the Development Project, Poynt disclosed to Innowi numerous pieces of

10  Poynt's confidential and trade secret information including, at minimum, Poynt's design

11  requirement documentation, operating system source code, and lists of Poynt's development-

12  related suppliers and vendors.  Innowi also developed confidential and trade secret information

13  for and belonging to Poynt as part of the Development project including, for example, hardware

14  schematics.

15         136.    While Innowi's obligations were in full force and effect, Innowi breached the

16  NDA by, as the evidence is likely to show after a reasonable opportunity for further investigation

17  or discovery, using Poynt's confidential information for improper purposes unrelated to the

18  business opportunity, including for the purposes of obtaining a patent and developing a

19  competing product and business.

20         137.    As a result of Innowi's breaches, the security and confidentiality of Poynt's

21  confidential information has been compromised and Poynt has been put in the position of

22  competing with a business whose product was developed with unfair advantages resulting from

23  Innowi's improper use of and reliance on Poynt's investment in its own confidential and propriety

24  information, causing Poynt to suffer damages in an amount to be determined at trial.

25         138.    As expressly agreed in the NDA, the unauthorized use and disclosure of Poynt's

26  confidential information has and will continue to cause Poynt to suffer irreparable harm.  This

27  irreparable harm includes loss of secrecy.  Further, if Poynt's merchants elect to install Innowi's

28  product rather than Poynt's, economic and time costs make it unlikely that the merchant will

1    replace its payment terminal infrastructure, leading to irreparable harm through the lasting

2    deprivation to Poynt of valuable business opportunities and market share.  These lost

3    opportunities may further cause irreparable harm by limiting Poynt's exposure in the industry and

4    thus stifling the momentum of the industry's adoption of Poynt's products and software platform.

5    Poynt is accordingly entitled to injunctive relief barring Innowi's unauthorized use of Poynt's

6    confidential information.  **Ex. A ¶ 7.**

7                    **Second Cause of Action – Breach of the Development Agreement**

8            139.    Poynt hereby realleges and incorporates by reference Paragraphs 1 through 138,

9    inclusive, of this First Amended Complaint, as though fully set forth herein.

10           140.    On June 2, 2015, Poynt and Innowi executed the Development Agreement.  The

11   Development Agreement was willingly agreed to by the parties without duress or undue influence

12   and is valid and enforceable.

13           141.    The Development Agreement refers to Whizz rather than Innowi, but both Poynt

14   and Innowi understood that the members of the Innowi team were responsible for performing the

15   obligation assigned to Whizz under the Development Agreement at the time that the Development

16   Agreement was signed.

17           142.    Insofar as Innowi claims that terms in the Development Agreement pertaining to

18   Whizz are not binding on it, Poynt relied on Hasnain's representations and conduct indicating that

19   Innowi was part of Whizz.  Hasnain knew that Innowi was not part of Whizz, and knew (from the

20   terms of the Development Agreement) that Poynt had been led to believe that Innowi was part of

21   Whizz.  Poynt relied on Hasnain's representations to its determinant because, had Poynt known

22   that Innowi was not part of Whizz, Poynt would not have entered into the Development

23   Agreement without clarifying (on a line by line basis) that the provisions of the Development

24   Agreement were binding on Innowi.  Put differently, had Hasnain not mislead Poynt into

25   believing that Whizz and Innowi were part of a single entity, Poynt would not have signed the

26   Development Agreement without clarifying (on a provision by provision basis) that Innowi was

27   bound by each of the specific terms of the Development Agreement, and without requiring an

28   NDA containing the same protections as the NDA that Poynt had previously signed with Whizz.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-CV-05814 BLF

143.   The Development Agreement is a writing signed by both Innowi and Poynt.  The Development Agreement was reasonable and supported by adequate consideration in that Poynt promised to pay Innowi for its services and Innowi promised, among other things, to provide those services.  Both Poynt and Innowi also had mutuality of remedies under the contract to enforce these promises, as Poynt owed Innowi obligations including obligations to pay Innowi, to continue to use Innowi as primary manufacturer, and to support Innowi's work with relevant subject matter experts.

144.   The Development Agreement provided that Poynt was to own all intellectual property associated with and derived as a result of the Development Agreement project.  This unqualified provision is sufficiently definite so as to permit a court to know that an attempt to claim ownership of such intellectual property would constitute a breach that could be enforced through equity.  Further, as a non-executory term of the Development Agreement, this obligation survives any termination of the Development Agreement.

145.   As officers of Innowi, Hasnain, Rao, and Saeed were bound by the terms of the Development Agreement.

146.   Poynt performed its obligations under the Development Agreement, including by paying over $700,000 to Innowi for services, materials, and parts, or was excused from performance of certain obligations by reason of Innowi's breaches (including its failure to timely deliver and/or to meet the cost targets in the Development Agreement).

147.   While Innowi's obligations were in full force and effect, Innowi breached the Development Agreement in two distinct ways.

148.   First, Innowi breached the Development Agreement by submitting several U.S. patent applications on alleged inventions that properly are owned by Poynt under the Development Agreement.  As set forth in detail above, the alleged inventions claimed in U.S. Patent Nos. 10,127,538 and 10,140,609 reflect intellectual property that is derived from Poynt's Development Project, and therefore is to be owned by Poynt under the terms of the Development Agreement.

149.    As a result of Innowi's breach, Poynt has been deprived of its rightful intellectual property rights and parts of Poynt's confidential information have been disclosed, causing Poynt to suffer damages in an amount to be determined at trial.

150.    Should Innowi be issued patents that are based on Poynt's product development and contractually owed to Poynt, Poynt will be irreparably harmed by the loss of exclusive rights in its properly owned intellectual property, and by being forced to compete against a company that claims exclusive rights in Poynt's products and/or limits Poynt's ability to expand the features and functionalities of its products.  Poynt is therefore entitled to equitable relief preventing Innowi from retaining ownership of intellectual property rights that it promised to Poynt and further mandating the assignment of Innowi's U.S. patent applications to Poynt.  Such an order of specific performance is substantially similar to the promise Innowi already made in the Development agreement acknowledging that Poynt was to own all intellectual property derived from the Development Project.

151.    Second, Innowi breached the Development Agreement by making use of trade secrets that that were associated with and derived as a result of the Development Agreement and therefore contractually belong to Poynt.

### Third Cause of Action – Misappropriation of Trade Secrets
### Under the California Uniform Trade Secrets Act

152.    Poynt hereby realleges and incorporates by reference Paragraphs 1 through 151, inclusive, of this First Amended Complaint, as though fully set forth herein.

153.    Poynt invested substantial resources in developing design documentations for its developing product, including assembly bills of materials, component data sheets, mechanical design files (including 3D designs), schematics, and printed circuit board designs.  Poynt likewise invested substantial resources in developing the source code for its proprietary operating system, including kernel and bootloader code, drivers, and APIs.  Poynt also maintained and protected lists of information crucial to the development and eventual success of Poynt's product, including lists of open development issues and lists of suppliers and vendors used to source components, parts and other services necessary for Poynt's product development.

154.   Because the above-discussed confidential information is crucial to the success of its business, Poynt makes substantial efforts to keep this information confidential and to keep it from its actual and potential competitors, others who could make economic use of the information, and from the public.

155.   Poynt has, at all relevant times, taken reasonable efforts to maintain the secrecy of this confidential information, including by imposing individualized PIN-based access to its facilities, requiring two-factor authentication on its development-related repositories, requiring its employees comply with strict, industry-mandated security policies, and ensuring its vendors and contractors working with sensitive information agree to protect Poynt's confidential information.

156.   The efforts that Poynt takes are reasonable under the circumstances to maintain the information's secrecy.  Poynt takes these measures to ensure the confidentiality of this information because this information derives independent economic value because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Poynt's competitors would obtain economic value from the use and disclosure of this information including by, for example, obtaining a "head start" as compared to the process of developing and supporting a payment terminal product and business without the improper use of this information.  Accordingly, the above-described information constitutes "trade secrets" under California's Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426, *et seq.*

157.   As a design manufacturing contractor involved in the development of hardware for the Poynt Smart Terminal device, Innowi acquired knowledge and custody of several of Poynt's trade secrets and developed trade secrets (both positive and negative) that belonged to Poynt under the terms of the Development Agreement.

158.   Innowi was contractually obligated to maintain the secrecy of those trade secrets and to limit their use pursuant to the NDA.  Innowi further knew or had reason to know that its knowledge of Poynt's trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of those trade secrets or limit their use—including because (a) the NDA expressly stated that Poynt's confidential and trade secret information would be protected; (b) the Development Agreement is expressly labeled as Confidential; (c) the Development Agreement

1   expressly says that Poynt owns all "Intellectual Property" associated with the Development

2   Project, which includes trade secrets and therefore requires maintaining their confidentiality; (d) it

3   is understood in the contract development business that was Innowi's main business that a client's

4   information is and must be protected; (e) Innowi was aware of the need for confidentiality as

5   demonstrated by its obligations to obtain NDAs from other parties working on the Development

6   Project (**Ex. G**); (f) during the course of performance of the Development Project, both sides

7   acted in conformity with their agreement and understanding that Poynt's confidential information

8   and intellectual property would be protected; and (g) even following the termination of the

9   Development Agreement, Innowi recognized its obligation not to use or disclose Poynt's

10   information in its response to Poynt's demand letter and in Innowi's draft termination agreement.

11        159.    Innowi misappropriated Poynt's trade secrets by improperly using Poynt's trade

12   secrets to develop and market a competing product and by disclosing Poynt's trade secrets to

13   others without authorization.

14        160.    The actions of Innowi constitute misappropriation of Poynt's trade secrets under

15   Cal. Civ. Code §§ 3426, *et seq.*

16        161.    Because Innowi knew of Poynt's ownership of trade secrets and nonetheless acted

17   in knowing disregard of those rights by making unauthorized use of Poynt's trade secrets to

18   develop a competing product, Innowi's acts of misappropriation were done willfully and

19   maliciously, thereby entitling Poynt to attorneys' fees and exemplary damages to be proved at

20   trial pursuant to Cal. Civ. Code §§ 3426.4, 3426.3(c).

21        162.    As a direct and proximate cause of Innowi's misappropriation of Poynt's trade

22   secrets, the evidence is likely to show after a reasonable opportunity for further investigation and

23   discovery that Innowi has been unjustly enriched at least by the amount(s) that Innowi has

24   received for pre-orders, has obtained a substantial head start, and Poynt has sustained damages in

25   an amount to be proven at trial.  Poynt has also suffered irreparable harm as a result of Innowi's

26   activities and will continue to suffer irreparable injury that cannot be adequately remedied at law

27   unless Innowi and all other persons acting in concert with it are enjoined from engaging in any

28   further such acts of misappropriation.  This irreparable harm includes loss of secrecy, the loss of

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

market share, and the loss and/or impairment of business opportunities.  Indeed, if Poynt's actual and potential merchant customers elect to install Innowi's product rather than Poynt's, economic and time costs make it unlikely that a customer will replace its payment terminal infrastructure, leading to irreparable harm through the lasting deprivation to Poynt of valuable business opportunities and market share.  Because Poynt's products are still new to the market, these lost opportunities may further cause irreparable harm by limiting Poynt's exposure in the industry and thus stifling the momentum of the industry's adoption of Poynt's products and software platform.

### Fourth Cause of Action – Misappropriation of Trade Secrets Under Federal Law

163.    Poynt hereby realleges and incorporates by reference Paragraphs 1 through 162, inclusive, of this First Amended Complaint, as though fully set forth herein.

164.    Poynt invested substantial resources in developing design documentation for its developing product, including assembly bills of materials, component data sheets, mechanical design files (including 3D designs), schematics, and printed circuit board designs.  Poynt likewise invested substantial resources in developing the source code for its proprietary operating system, including kernel and bootloader code, drivers, and APIs.  Poynt also maintained and protected lists of information crucial to the development and eventual success of Poynt's product, including lists of open development issues and lists of suppliers and vendors used to source components, parts and other services necessary for Poynt's product development.

165.    Because the above-discussed confidential information is crucial to the success of its business, Poynt makes substantial efforts to keep this confidential information from its competitors and the public.

166.    Poynt has, at all relevant times, taken reasonable efforts to maintain the secrecy of this confidential information, including by imposing individualized PIN-based access to its facilities, requiring two-factor authentication on its development-related repositories, requiring its employees comply with strict, industry-mandated security policies, and ensuring its vendors and contractors working with sensitive information agree to protect Poynt's confidential information.

167.    The efforts that Poynt takes are reasonable under the circumstances to maintain the secrecy of the information.  Poynt takes these measures to ensure the confidentiality of this

information because this information derives independent economic value because it is not generally known to the public or to other persons who can obtain economic value from its disclosure or use.  Poynt's competitors would obtain economic value from the use and disclosure of this information including by, for example obtaining a "head start" as compared to the process of developing and supporting a payment terminal product and business without the improper use of this information.  Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*

168.    As a design manufacturing contractor involved in the development of hardware for the Poynt Smart Terminal device, Innowi acquired knowledge and custody of several of Poynt's trade secrets and developed trade secrets (both positive and negative) that belonged to Poynt under the terms of the Development Agreement.

169.    Innowi was contractually obligated to maintain the secrecy of those trade secrets and to limit their use pursuant to the NDA.  Innowi further knew or had reason to know that its knowledge of Poynt's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of those trade secrets or limit their use—including because (a) the NDA expressly stated that Poynt's confidential and trade secret information would be protected; (b) the Development Agreement is expressly labeled as Confidential; (c) the Development Agreement expressly says that Poynt owns all "Intellectual Property" associated with the Development Project, which includes trade secrets and therefore requires maintaining their confidentiality; (d) it is understood in the contract development business, which was Innowi's main business, that a client's information is and must be protected; (e) Innowi was aware of the need for confidentiality as demonstrated by its obligations to obtain NDAs from other parties working on the Development Project (**Ex. G**); (f) during the course of performance of the Development Project, both sides acted in conformity with their agreement and understanding that Poynt's confidential information and intellectual property would be protected; and (g) even following the termination of the Development Agreement, Innowi recognized its obligation not to use or disclose Poynt's information in its response to Poynt's demand letter and in Innowi's draft termination agreement.

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

1    170.    Innowi misappropriated Poynt's trade secrets by improperly using Poynt's trade

2    secrets to develop and market a competing product and by disclosing Poynt's trade secrets

3    without authorization.

4    171.    The misappropriated trade secrets relate to products and services used in, or

5    intended for use in, interstate or foreign commerce.  Poynt's products made with the benefit of the

6    trade secrets are sold in numerous states and countries.  As the evidence is likely to show after a

7    reasonable opportunity for further investigation or discovery, Innowi plans to sell its product

8    developed with the benefit of Poynt's trade secrets in several states and in foreign countries.

9    172.    The actions of Innowi constitute misappropriation of Poynt's trade secrets under

10   18 U.S.C. § 1836, *et seq.*

11   173.    Because Innowi knew of Poynt's ownership of trade secrets and nonetheless acted

12   in knowing disregard of those rights by making unauthorized use of Poynt's trade secrets to

13   develop a competing product, Innowi's acts of misappropriation were done willfully and

14   maliciously, thereby entitling Poynt to attorneys' fees and exemplary damages to be proved at

15   trial pursuant to 18 U.S.C. §§ 1836(b)(3)(c)-(d).

16   174.    As a direct and proximate cause of Innowi's misappropriation of Poynt's trade

17   secrets, the evidence is likely to show after a reasonable opportunity for further investigation and

18   discovery that Innowi has been unjustly enriched at least by the amount(s) Innowi has received

19   for pre-orders, has obtained a substantial head start, and Poynt has sustained damages in an

20   amount to be proven at trial.  Poynt has also suffered irreparable harm as a result of Innowi's

21   activities and will continue to suffer irreparable injury that cannot be adequately remedied at law

22   unless Innowi and all other persons acting in concert with it are enjoined from engaging in any

23   further such acts of misappropriation.  This irreparable harm includes loss of secrecy, the loss of

24   market share, and the loss and/or impairment of business opportunities.  Indeed, if Poynt's actual

25   and potential merchant customers elect to install Innowi's product rather than Poynt's, economic

26   and time costs make it unlikely that a customer will replace its payment terminal infrastructure,

27   leading to irreparable harm through the lasting deprivation to Poynt of valuable business

28   opportunities and market share.  Because Poynt's products are still new to the market, these lost

1  opportunities may further cause irreparable harm by limiting Poynt's exposure in the industry and

2  thus stifling the momentum of the industry's adoption of Poynt's products and software platform.

3  **IV.   PRAYER FOR RELIEF**

4  175.   WHEREFORE, Poynt respectfully requests that the Court enter judgment against

5  Innowi as follows:

6  a.   that Poynt be awarded compensatory damages for actual loss and unjust

7  enrichment caused by the misappropriation of Poynt's trade secret information,

8  including by ordering Innowi to disgorge the full value of the head start that it

9  received;

10  b.   that the Court award exemplary damages equal to two times the amount of

11  compensatory damages awarded for trade secret misappropriation pursuant to 18

12  U.S.C. §§ 1836(b)(3)(d) and Cal. Civ. Code § 3426.3(c);

13  c.   that the Court issue a preliminary and permanent injunction (i) prohibiting Innowi

14  from using, accessing, disclosing or continuing to possess Poynt's trade secret

15  information and (ii) ordering the return of Poynt's trade secret and confidential

16  information and all intellectual property associated with and developed pursuant to

17  the Development Agreement;

18  d.   that the Court find Innowi liable for damages caused by Innowi's breach of the

19  NDA;

20  e.   that the Court award Poynt damages and unjust enrichment caused by Innowi's

21  breach of the Development Agreement;

22  f.   that the Court order U.S. Patent Nos. 10,127,538 and 10,140,609 and U.S. Patent

23  Application Nos. 15/721,923 and 16/178,558 be assigned to Poynt as required by

24  the Development Agreement;

25  g.   that the Court order an accounting for damages through judgment and post-

26  judgment until Innowi is permanently enjoined from further damaging activities;

27  h.   that the Court award Poynt all damages caused by Innowi's unlawful actions;

28

FIRST AMENDED COMPLAINT FOR
DAMAGES AND EQUITABLE RELIEF
5:18-cv-05814 BLF

1    i.   that the Court award Poynt its reasonable attorneys' fees and costs pursuant to 18

2         U.S.C. §§ 1836(b)(3)(d) and Cal. Civ. Code § 3426.4;

3    j.   that the Court award Poynt pre-judgment interest and post-judgment interest at the

4         maximum rate allowed by law, including an award of prejudgment interest,

5         pursuant to 25 U.S.C. § 284, from the date of harms to the day a damages

6         judgment is entered, and a further award of post-judgment interest, pursuant to 28

7         U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate

8         allowed by law; and

9    k.   that the Court grant Poynt all other relief to which it is entitled and such other

10        additional relief as is just and proper.

11              **V.      DEMAND FOR JURY TRIAL**

12   Poynt hereby demands a trial by jury in this action.

13
Dated:  March 25, 2019                    ORRICK, HERRINGTON & SUTCLIFFE LLP
14

15

16                                         By: _____*/s/ Clement Seth Roberts*_____
                                                CLEMENT SETH ROBERTS
17                                              JACOB M. HEATH
                                                WILL MELEHANI
18                                              JOHANNA L. JACOB
                                           Attorneys for Plaintiff Poynt Corporation
19

20

21

22

23

24

25

26

27

28